HUGHES, Administrator, et al. v. RADER et al., Appellants.

Division Two, July 2, 1904.

1. **WILL: Signing and Attesting.** Where the evidence shows that witnesses are present for the purpose of attesting a will, that the will is prepared in the presence of the testatrix, that it is read to her, that she signs it and it is passed to a table in the same room, and there, in the presence of testatrix and of each other, the witnesses sign it—such acts constitute, in effect, a request from the testatrix that the witnesses sign the will. And the mere fact that one of the beneficiaries, who drew the will, requested the attendance of the witnesses, and the fact that testatrix does not proclaim the paper to be her last will and testament, nor verbally request the witnesses to attest it, are not sufficient to annul the will on the ground of non-compliance with the statute.

2. ———: **Mental Capacity.** Where the evidence shows that testatrix, at the time of the execution of the will, understood who her children were, what her property was, and what disposition she was making of it, it must be held that she was possessed of sufficient mental capacity to make the will. The testimony of witnesses that testatrix was weak and in feeble health and that her mind was not as strong and vigorous as when she was in perfect health, can not be made the basis to support a finding that she was mentally incapacitated to make a will.

3. ———: **Undue Influence: Conspiracy: Instruction.** Where the evidence fails to show a conspiracy between beneficiaries to unduly influence testatrix in the execution of the will, an instruction based upon that theory is properly refused.

4. ———: ———: **What Constitutes: Discrimination: Draughts-**
man **as Beneficiary.** The undue influence necessary to invali-
date a will must be such as amounts to over-persuasion, coercion
or force, destroying the free agency and will-power of the testa-
tor. The fact that the will was prepared by a beneficiary, and
the fact of unjust discriminations in its provisions, are not suf-
ficient to overcome the validity of the will, or to shift the bur-
den of proof upon proponents; but such facts are to be consid-
ered in connection with all the other facts and circumstances
tending to establish undue influence.

5. ———: **Instruction: Singling out Facts.** An instruction, in a
will contest, should not single out certain facts and circum-
stances in evidence and direct the jury to consider them, without
further requiring that such facts and circumstances should be
considered in connection with all the other facts in proof.

6. ———: **Evidence: Quarrels Between Husband and Son of Tes-**
tratrix. Evidence of quarrels between a father and son, in a
suit contesting the wife and mother's will, which quarrels oc-
curred five years before the will was executed, should not have
been admitted, since it could serve no purpose except to arouse
the prejudice of the jury.

Appeal from Pettis Circuit Court.— *Hon. Geo. F. Lon-*
*gan,* Judge.

REVERSED AND REMANDED.

*Sangree & Lamm* and *Barnett & Barnett* for ap-
pellants.

(1) There was no substantial evidence showing or
tending to show that testatrix was not possessed of tes-
tamentary capacity ·at the time the will was made.
Under such circumstances it was the duty of the court
to give a peremptory instruction in favor of defend-
ants sustaining the will. Crowson v. Crowson, 172 Mo.
691; McFadin v. Catron, 138 Mo. 196; s. c., 120 Mo. 252;
Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo.
354; Fulbright v. Perry County, 145 Mo. 432; Wood v.
Carpenter, 166 Mo. 465; Riggin v. Westminster Col-
lege, 160 Mo. 578; Martin v. Bowdern, 158 Mo. 379. (a)
It is not necessary in this case that Mrs. Rader should

have had the mental capacity to control and conduct her ordinary business affairs, but it is only necessary that she have sufficient understanding to comprehend the nature of the transaction that she was then engaged in, the nature and extent of her property and to whom she desired to give it and was giving it. Crossan v. Crossan, 169 Mo. 631; Brinkman v. Rueggesick, 71 Mo. 553; Couch v. Gentry, 113 Mo. 248; Maddox v. Maddox, 114 M. 35; Jackson v. Hardin, 83 Mo. 175; Farmer v. Farmer, 129 Mo. 538; Southworth v. Southworth, 173 Mo. 59; Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo. 354; Wood v. Carpenter, 166 Mo. 465; Martin v. Bowdern, 158 Mo. 379. (b) A person may be entirely competent to make a will and yet incompetent to make a contract. It requires greater mental capacity to make a contract than to make a will. A person may be capable of making a will who is not capable of managing his estate. Crossan v. Crossan, 169 Mo. 640; Brinkman v. Rueggesick, 71 Mo. 553; Von De Veld v. Judy, 143 Mo. 369; Crowson v. Crowson, 172 Mo. 691. (c) Imperfect memory caused by sickness or old age, forgetfulness of names of persons she had known, idle questions or requiring repetition of information, eccentricities or peculiarities will not be sufficient to establish incompetency if the testatrix has sufficient intelligence remaining to understand what she is doing. Southworth v. Southworth, 173 Mo. 72; McFadin v. Catron, 138 Mo. 217; McFadin v. Catron, 120 Mo. 267; Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo. 354; Fulbright v. Perry County, 155 Mo. 432; Wood v. Carpenter, 166 Mo. 465; Riggin v. Westminster College, 160 Mo. 570; Martin v. Bowdern, 158 Mo. 379. (d) Mere opinion of non-expert witnesses, unaccompanied by any testimony showing any particular act or fact evincing incompetency (as in this case) do not make out a case of mental incapacity where the testimony shows that the testatrix knew what she was doing and to whom she was giving her property. Southworth v.

Southworth, 173 Mo. 73; Wood v. Carpenter, 166 Mo. 465; Riggin v. Westminster College, 160 Mo. 570; Crowson v. Crowson, 172 Mo. 702. (e) The law indulges the presumption that the testatrix was possessed of a sound and disposing mind. Riggin v. Westminster College, 160 Mo. 570. (f) There is not a scintilla of evidence to sustain the allegation of conspiracy, or the allegation that the use of drugs, stimulants and medicine had impaired testatrix's mind. (2) The influence denounced by the law must be such as amounts to overpersuasion, coercion or force, destroying the very agency or will-power of the testator and substituting therefor the will of another. McFadin v. Catron, 138 Mo. 197; Lorts v. Wash, 175 Mo. 502; Berberet v. Berberet, 131 Mo. 399; Martin v. Bowdern, 158 Mo. 379; Crowson v. Crowson, 172 Mo. 691; Sehr v. Lindemann, 153 Mo. 276; Defoe v. Defoe, 144 Mo. 458; Carl v. Gabel, 120 Mo. 283; Norton v. Paxton, 110 Mo. 456. (a) Such influence must have so dominated the will of the testator at the time of the execution of the instrument that it was not in fact the testator's will but that of the beneficiary. Mere undue influence is not sufficient to invalidate the will. Such influence must be so exercised as to result in the will made, and it will not do so then, if such influence was that of a child and was exercised in a fair and reasonable manner without fraud or deception. It is not the influence of affection that the law denounces. Crowson v. Crowson, 172 Mo. 702; Tibbe v. Camp, 154 Mo. 545; Campbell v. Carlisle, 162 Mo. 634; Kirschman v. Scott, 166 Mo. 214; Wood v. Carpenter, 166 Mo. 465; McFadin v. Catron, 138 Mo. 197; Sehr v. Lindemann, 153 Mo. 276; Cash v. Lust, 142 Mo. 630; Thompson v. Ish, 99 Mo. 160; Norton v. Paxton, 110 Mo. 456. (b) The presumption is in favor of the validity of the will, and the fact of unjust discrimination in its provisions, if such be the case, and the fact that the will was written by Bruce Rader, one of the devisees, did not shift the burden of establishing the will on the

defendants; and this is true even if Bruce Rader had great influence over his mother with respect to her business affairs. A testator having sufficient mental capacity has the right to make an unreasonable, unjust, injudicious will and his neighbors have no right, sitting as a jury, to alter the disposition of his property simply because they may think the testator did not do justice to his family connections.    Berberet v. Berberet, 131 Mo. 410; Tibbe v. Camp, 154 Mo. 584; Martin v. Bowdern, 158 Mo. 379; McFadin v. Catron, 138 Mo. 225; Maddox v. Maddox, 114 Mo. 35.    (3)    The court erred in refusing to give instruction 1 asked by defendants. The evidence conclusively shows that the will was properly signed and attested.    There was no competent evidence to the contrary.    Under the authorities in this State the evidence here established the execution of the will.    Craig v. Craig, 156 Mo. 359; Holmes v. Holmes, 12 Mo. 535; Lorts v. Wash, 175 Mo. 503; Mayes v. Mayes, 114 Mo. 541; Southworth v. Southworth, 173 Mo. 74; Moore v. McNulty, 164 Mo. 111; Martin v. Bowdern, 158 Mo. 379; Schierbaum v. Schemme, 157 Mo. 1; Grimm v. Tittman, 113 Mo. 56.    It is not necessary that the testatrix should have made a formal declaration in the presence of the witnesses that it was her last will she was signing, and no formal verbal request by her of the witnesses to attest it was necessary.    The testatrix said in the presence of the witnesses that she "wanted the will wrote."    She dictated it and it was written in the presence of the witnesses; was read over to her in their presence and signed by her in their presence and by them in her presence.    One of the witnesses held her up in bed to enable her to sign the same.    He was named in the will as executor and took charge of it after it was written.    The witnesses went to her house to act as witnesses and remained in the room with testatrix an hour and a half while the will was there being written. After she had dictated the will it was read over to her and she signed it and the witnesses signed it as witnesses

in her presence after hearing her say she desired it made. This made a sufficient request. Martin v. Bowdern, 158 Mo. 379; Moore v. McNulty, 164 Mo. 111; Schierbaum v. Schemme, 157 Mo. 1.

*W. D. Steele* and *John Cashman* for respondents.

(1) There was a total failure of proof as to the formal execution of the will and its attestation. Neither of the attesting witnesses was requested by the testatrix, directly or indirectly, by word, act or sign, to subscribe to the will as witness. Under this state of evidence the court should have instructed the jury to find for the plaintiffs as requested. Grimm v. Tittman, 113 Mo. 65; Norton v. Paxton, 110 Mo. 461; Miltenberger v. Miltenberger, 78 Mo. 31. The introduction of Bruce Rader as a witness to prove the execution of the will, upon proponents' failure of proof by the subscribing witnesses, was wholly unwarranted. He being one of the chief beneficiaries, receiving one-half under the will, when he would receive but one-fifth in the event of "no will," was not competent from any point of view as a witness. Miltenberger v. Miltenberger, 78 Mo. 31. (2) Under the evidence the question of the capacity or incapacity of the testatrix to make a will was for the jury, and the court was right in refusing defendants' instruction taking this issue from the jury. Aylward v. Briggs, 145 Mo. 604; Dingman v. Romine, 141 Mo. 466; Martin v. Baker, 135 Mo. 495; Couch v. Gentry, 113 Mo. 248; Thompson v. Ish, 99 Mo. 160; Myers v. Hauger, 98 Mo. 433; Harvey v. Sullens, 46 Mo. 147. Where, as in this case, the deceased was, at the time of executing her will, old and infirm in body and feeble in mind, and incapable of transacting ordinary business, she has not sufficient capacity to make a will. Harvey v. Sullens, 46 Mo. 147. The testamentary capacity of the testatrix and undue influence exercised upon her being in issue, it becomes material to know what were her previous pur-

poses, intentions and state of mind, and statements by her at, before and after making the will are competent evidence for these purposes. Carl v. Gabel, 120 Mo. 283; Thompson v. Ish, 99 Mo. 160; Myers v. Hauger, 98 Mo. 433. (3) The proof of contestants as to undue influence and fraud was overwhelming and the court correctly refused proponents' instruction C taking that issue from the jury. Pressure of whatever character, whether acting on the fears or the hopes, if so exercised as to overpower the volition without convincing the judgment, is a species of restraint under which no valid will can be made. Importunity or threats, such as the testator has not the courage to resist, moral command asserted and yielded to for the sake of peace and quiet, or of escaping from distress of mind or social discomfort, if carried to a degree in which the free play of the testator's judgment, discretion, or wishes is overborne, will constitute undue influence, though no force is either used or threatened. In a word, a testator's will must be the offspring of his own volition. Gay v. Gillilan, 92 Mo. 261; Gordon v. Burris, 153 Mo. 223; Gordon v. Burris, 141 Mo. 602; Carl v. Gabel, 120 Mo. 297; Harvey v. Sullens, 46 Mo. 147; Dingman v. Romine, 141 Mo. 475; Schierbaum v. Schemme, 157 Mo. 11; Martin v. Baker, 135 Mo. 495; Garland v. Smith, 127 Mo. 581; Thompson v. Ish, 99 Mo. 160; Myers v. Hauger, 98 Mo. 433; Muller v. Hospital, 73 Mo. 242; Harvey v. Sullens, 46 Mo. 147. In determining whether the will was the result of undue influence it was proper for the jury to consider the physical condition as well as the mental condition of the testatrix.

FOX, J.—This is a suit by respondents, contesting the will of Elizabeth R. Rader, deceased.

The instrument involved in this contest is as follows:

"In the name of God, Amen.

"I, Elizabeth R. Rader, of the county of Pettis, and

of the State of Missouri, being of sound and disposing mind and memory, do make, publish and declare this to be my last will and testament.

"First. I direct that all my just and legal debts be paid out of my personal estate.

"Second. I give, devise and bequeath to my grandson, Garland Byrne, one dollar.

"To my granddaughter, Marie Byrne, one dollar.

"To Lala Puntney, my daughter, one dollar.

"To Giles D. Rader one dollar.

"To Julia Fowland and Bruce Rader all my real estate and personal property, to be divided equally.

"Third. I appoint and constitute Jos. DeJarnett executor of this my last will and testament without bond.

"In testimony hereof, I have hereunto subscribed my name this sixteenth day of December, A. D., 1899.

"ELIZABETH R. RADER.

"The foregoing instrument was at the date thereof signed and declared by said Elizabeth R. Rader to be her last will and testament in the presence of us who at her request and in her presence and in the presence of each other subscribed our names hereto as witnesses to the same.

"This the sixteenth day of December, A. D., 1899.

"J. P. GEORGE,
"JOS. DeJARNETT."

The will was filed in the office of the probate court of Pettis county December 28, 1899. On the second day of January, 1900, proof in due form was made, and the record introduced showing the admission to probate of the will.

This contest and the relief sought by it, is predicated upon the following grounds. It is averred in the petition:

"That said paper-writing is not the last will and testament of the said Elizabeth R. Rader, as on its face purports to be, but that the same was made at a time

when the mind of the said deceased was impaired by disease and physical suffering and bodily decay and dissolution and by the use by the deceased of strong drugs, stimulants and medicines, so that she had no knowledge or understanding of what she was doing at the time she was induced, as hereinafter stated, to go through the form of executing said will; that at the time said writing is purported to have been executed, the mind of the said deceased was wholly lost, and she knew nothing of the meaning, import or effect of the said writing, and did not know and had not the mental capacity to know or understand what disposition she was making, or which said writing purported to make, of her said property, and she did not in truth and in fact know that the said paper writing even purported to be her last will and testament.

"Plaintiffs further state that the defendants, George Deneal Rader, alias R. Bruce Rader, and defendant, Julia Fowland, conspired and confederated together for a time prior to the purported execution of said paper writing to cheat and defraud all of the other heirs of the said deceased out of their share and interest in the estate of their mother and grandmother respectively; that for the purpose of carrying out the said conspiracy and design to so cheat and defraud these plaintiffs, they worked upon the mind and feelings of the deceased, their mother, by false and fraudulent representations and statements and thereby undertook to and did prejudice the deceased against these plaintiffs; that at the time and just prior to the time of the purported execution of said paper writing the defendants last above named exercised and possessed an undue and empowering influence upon the mind and actions of the said deceased and that on account of the feeble and demented condition of the deceased at the time of the execution or pretended execution of said writing, and on account of false and fraudulent representations and statements made by them to the deceased, and on ac-

count of their undue and empowering influence over the mind and actions of the deceased, they having previously prepared with their hands said paper writing, went through the form of having the same executed."

The separate answers of the defendants admit the execution of the will and the relationship of the parties as set forth in the petition, and deny all the other allegations.

Omitting caption, the proof of the will, as made before the clerk of the probate court, was as follows:

"Be it remembered, That on this, the second day of January, A. D., 1900, before me, J. B. Harris, clerk of the probate court, held in and for the county and State aforesaid, personally appeared Jos. DeJarnett and J. P. George, who are the subscribing witnesses to the annexed will of Elizabeth R. Rader, deceased, and being first by me duly sworn, depose and say that the said Elizabeth R. Rader, the testatrix, subscribed the same in their presence, and published and declared said will or instrument of writing to be her last will and testament, and that at the time of signing the same she, the said testatrix, was of sound and disposing mind, and more than eighteen years of age, and that said deponents attested said will as witnesses thereto by subscribing their names to the same in the presence of the testatrix and of each other, and at the request of said testatrix.

"Jos. DeJarnett,
"J. P. George.

"Sworn and subscribed before me, J. B. Harris, clerk of the probate court, this second day of January, A. D., 1900.

"(Seal)                J. B. Harris,
"Clerk of the probate court."

We have read in detail the testimony as disclosed by the record upon which this cause was tried; it makes an immense volume. There is a great deal of imma-

terial matter embraced in this record, which only served to confuse the triers of the facts upon the vital issues presented by the pleadings.

We shall be content with such statements of the testimony as will enable us to determine the legal propositions involved. One of the questions at the very inception of this case, involves the sufficiency of the testimony as to the formal execution of the will; hence we reproduce the full statement of the testimony of the two attesting witnesses.

John P. George testified as follows:

Q. Your name is what? A. John P. George.

Q. Where do you live? A. I live west of the city about eight miles.

Q. What is your business? A. Farming.

Q. Do you know where Mrs. Elizabeth R. Rader lived in her lifetime? A. Yes, sir.

Q. How far did you live from there? A. About a mile and a quarter.

Q. You may look at that will and also, in connection with it, the names of the attesting witnesses? (Showing witness paper marked Exhibit "A") A. Yes, sir.

Q. State whether or not that is your signature? A. Yes, sir, that is mine.

Q. Whose is the other signature? A. Mr. Joe DeJarnett's, I guess.

Q. Joseph DeJarnett? A. Yes, sir.

Q. Are you the same J. P. George who appeared before the probate court? A. Probate judge, yes, sir.

Q. Now, Mr. George, I see your name there as a witness to the will of Mrs. Elizabeth Rader. You knew Mrs. Elizabeth Rader? A. Yes, sir.

Q. How long had you known her? A. About twenty-five years.

Q. Well acquainted with her? A. Well, moderately acquainted.

Q. When did you go there with regard to the at-

testing of this will? A. It was on the sixteenth day of December, 1899.

Q. Who requested you to come there? A. Joseph DeJarnett.

Q. The other witness to the will? A. Yes, sir.

Q. Did you go with him? A. No, sir. He went before I did. I wasn't ready to go.

Q. Where was he at the time? A. He was at my house.

Q. At the time he requested you to go? A Yes, sir.

Q. How far does he live from you? A. He lives about a quarter.

Q. You went there then on this day? ,A. Yes, sir.

Q. What time of day was it? A. When the will was drawn up?

Q. Yes, sir? A. Between ten and twelve o'clock.

Q. In the forenoon? A. Yes, sir.

Q. Who was present there? A. Mr. DeJarnett and Mr Rader, who wrote the will, and Mrs. Rader and myself was all. Nobody present that I seen.

Q. Who do you mean by Mr. Rader? A. Bruce Rader.

Q. What Mr. DeJarnett do you refer to? A. Joseph DeJarnett.

Q. The other witness to the will? A. Yes, sir.

Q. Just go ahead and state all that happened there with regard to the execution of the will? A. I don't know hardly how to begin there.

Q. Begin in your own way. A. Mr. Rader went to writing it of course.

Q. How was that? A. He started to write it and after he got so far along he spoke to his mother as to what he should do and his mother told him what to do, items as it was, one dollar apiece for those three children.

Q. Was the will written there in your presence? A. Yes, sir.

Q. By Mr. Rader? A. Mr. Rader, yes, sir.

Q. How did he get his information as to what he wrote down; who told him what to write? A. At the beginning he had something to go by.

Q. A form? A. Yes, sir, but when he came to how to distribute this property he asked his mother, and he says, "Mother, what now?" and she just spoke up and told him.

Q. Were those matters that are written down here as she told him? A. You will have to read that to me.

Q. Was the will read over there to her? A. Yes, sir.

Q. Was it read over to her as she had indicated it? A. As well as I remember it was.

Q. Was it read to her after it was written? A. Yes, sir, it was read to her after it was written before she signed it.

Q. What next was done then after it was written? A. Then it was handed to her to sign.

Q. Did she sign it? A. Yes, sir, I guess so.

(By Mr. Steele): We don't want any guesses. A. I was sitting back in the room. I didn't see that, because these four gentlemen were there. I was sitting so I couldn't see. I couldn't say that she signed the will because I didn't see it.

Q. What did you see? A. They made preparations. They got her a book and also gave her a pen, and I remember that she said the pen had no ink on it, and one of those parties walked back and put the pen in the ink again. I remember of hearing that, but I never got up to see if she had the pen, because these parties were between me and the party signing the will and of course that cut me off from seeing.

Q. What did she say? A. I couldn't say that she said any more about the will.

Q. Where were you during the entire time? A. I was in the southwest corner of the room like.

Q. You were in the room? A. Yes, sir.

Q. Then what was done next with regard to attesting the will? A. Why, myself and Mr. DeJarnett signed the will.

Q. Where was she when you signed it? A. She was lying on the bed.

Q. Where were you with regard to the bed? A. We was in the southeast corner of the room where the stand was, where he wrote the will, and the bed was in the north part of the house.

Q. How came you to sign the will? A. I suppose because they wanted me to.

Q. Who wanted you to? A. I guess Mr. DeJarnett and Mr. Rader, I don't know.

Q. You say you don't know? A. No, sir. I never was instructed by Mr. Rader to sign the will.

Q. What did she say, if anything? A. She said very little. She just said she wanted this will wrote.

Q. When it was read over to her what did she say, if anything? A. She never said anything that I remember of.

Q. How long had you been there prior to the time this will was written? A. I hadn't been there since Mr. Rader was buried, and I think that was in July. I had never seen Mrs. Rader to speak to her that I remember of.

Q. How long were you there on this day before the will was signed? A. I don't think I was there over an hour and a half—two hours.

Q. Did you speak to Mrs. Rader when you went in? A. Yes, sir.

Q. Did you have any conversation? A. Not much. Spoke and shook hands, and she asked me how I was getting along, and so on.

Q. Did you tell her what you came for? A. No, sir.

Q. Did she say anything about your being there?
A. No, sir.

(By Mr. Steele): Just let him tell what was said.

Q. Now, Mr. George, you say she spoke to you and she asked how you were? A. Yes, sir.

Q. Did you talk about your affairs or her affairs or her health? A. Very little. All I remember of hearing her speak about, she asked me how I was getting along, and she said she was suffering very much, and she spoke up once and said, wanted to know if I had ever been so that an hour's rest would help me. It showed the old lady was suffering.

Q. Now, before Bruce sat down and commenced writing this will what was said about a will, if anything?

Q. What was said? A. About the will?

Q. Yes, sir? A. There wasn't anything.

Q. When was the first time that any conversation took place between her and Bruce with regard to the will, about the will that you heard?

Q. When was the first you heard? A. What do you mean?

Q. I mean when in this conversation there was the first talk that was had between her and Bruce or anybody else with regard to a will, with regard to the will? A. Well, Mr. Rader went to writing this will and when he got so far along with this will, itemizing this property, he says, "Now mother," and she answered the question—

Q. From what you knew of Mrs. Rader and what you saw there and the conversations you heard there and the directions you heard her give, state the condition of her mind. A. There was nothing wrong with her mind that I detected. I don't think there was anything wrong with her mind that I could detect. What few words she said was just as natural as she always was as far as I could detect. I couldn't tell anything wrong.

CROSS-EXAMINATION.

Q. Mr. George, I would like to have you locate to the jury, if you can, that room. Which way was the room the longest, north or south or east or west? A. I couldn't say but what it was square.

Q. Nearly about square? A. I think it was.

Q. Now the bed Mrs. Rader was lying in was in the northeast corner of the room, was it? A. Well, partly. There was a stove about here and the bed was near the stove (indicating on a piece of paper). Here is the stand table, and here is about where I was.

Q. The bed that Mrs. Rader was lying in that day when you went there, the day that you signed your name to this paper? A. Yes, sir.

Q. Was in the northeast corner of the room? A. Near the northeast corner. It wasn't quite in the northeast corner.

Q. Which way was Mrs. Rader's head turned? A. To the west.

Q. To the west or east? A. West.

Q. The stove was where with reference to her head? A. The stove was south of her head.

Q. South of her head? A. Yes, sir.

Q. What was the size of that room? A. Why, I would suppose fourteen by sixteen.

Q. About that? A. Yes, sir.

Q. You were sitting in a chair in the southwest corner when you first came in? A. Yes, sir.

Q. Where was Mr. Joseph DeJarnett? A. Well, there was a part of the time I think he was sitting right near the side of her.

Q. Right near the bed? A. Yes, sir.

Q. Where was Bruce Rader? A. When he was writing this?

Q. Yes, sir? A. He was sitting in the southeast corner.

Q. Was that stand right in the corner? A. I think it was.

Q. Right up in the corner? A. I will not say it was clear up in the corner.

Q. Which way was his face turned when he was writing? A. Turned east.

Q. With his side to the bed his mother was in? A. Yes, sir.

Q. You said you heard Bruce ask his mother something about the dollar allowances that were put in this will, is that right? A. No, sir.

Q. Did you say anything about it? A. I want to understand you about this dollar?

Q. You said he wrote a part of the will? A. Yes, sir.

Q. When he got down to the place where— A. The property was to be divided?

Q. And the Byrne children were to go in and Giles Rader were to go in and Mrs. Puntney were to go in? A. Yes, sir.

Q. And then there was something said about the dollar apiece? A. He said to his mother, "Mother, what now?" and she said, I want a dollar for a certain child. I don't know which child. There were children all around.

Q. You didn't pay any attention to that, did you? A. Not a great deal.

Q. You were waiting for him to finish his task and supposed you would be called to witness it after it was over. A. Yes, sir.

Q. Isn't it a fact that you can't tell this jury whether he said a dollar was to be given to himself or to someone else? A. She said so, a dollar to each one of these children.

Q. You didn't hear her name them? A. Oh, yes, yes, sir; she named them.

Q. She was lying right on her back? A. Yes, sir.

Q. How long did he occupy in writing the will, written by Bruce? A. Probably an hour and a half.

Q. An hour and a half? A. Or probably two hours.

Q. Now, after it was prepared it was taken over to the bed, was it? A. Yes, sir.

Q. She was so weak that Mr. DeJarnett had to put his hand under her back and raise her up in bed? A. He and Mr. Rader together.

Q. Then they got a book? A. Yes, sir.

Q. And Bruce took the book and laid the paper on there, is that right? A. I can't say that for sure, because both of these men was between me and Mrs. Rader.

Q. And you were still sitting down in the southwest corner of the room? A. Yes, sir.

Q. And didn't see Mrs. Rader sign that will at all? A. No, sir; I never seen Mrs. Rader sign that will.

Q. You don't know whether she signed it at all or not? A. No, sir, because I never seen her.

Q. She didn't request either you or Mr. DeJarnett to sign it as witnesses? A. No, sir.

Q. She made no request directly or indirectly to you to sign it? A. No, sir.

Q. At any time? A. No, sir, if she did I don't remember it.

Q. No one made any such request for her at that time? A. No, sir.

Q. At any time while you were there that day? A. No, sir.

Q. When you signed it as a witness, Mr. George, you were over at the stand table? A. Yes, sir.

Q. She was lying flat on her back in bed? A. I wouldn't say. I think they had been leaving her sitting up a while, and she might have been sitting up that day.

Q. Isn't it a fact that she couldn't sit up that day? A. Not very long.

Q. Isn't it your best recollection about that that

she didn't sit up; that they laid her right back down where she was? You don't remember of her sitting up? A. I don't remember whether she did or didn't, but I remember of them raising her up to sign this will.

Q. And your best recollection is that they laid her back and came over to the stand? A. (Not answered.)

Q. I will ask you whether or not she was looking in the direction where you was when she signed it? A. I don't know.

Q. What is your best judgment and recollection about that fact—was she looking at you? A. I don't know whether she was or not.

Q. If she was looking at you she wasn't in a position that she could see you—you were sitting at a table with your back partly towards her? As far as you can tell now, as far as you recollect, you don't know whether she was looking at you when she signed that will or not, do you? A. No, sir.

Q. I will ask you if the paper wasn't lying flat on the stand table in the southeast corner of the room when you signed it? A. Well, yes, sir.

Q. She was in what corner? A. Southeast corner.

Q. The northeast corner? A. Northeast corner, yes, sir.

Q. The bed was in the northeast corner. A. Yes, sir.

Q. And she was in the bed? A. Yes, sir.

Q. She was in the same position so far as you know when Mr. Joseph DeJarnett signed it? A. I couldn't tell you but what she was.

Q. You both signed it about the same time? A. Yes, sir. I may have signed it first or he may have signed it first.

Q. You don't recollect about that? A. No, sir.

Q. You are positive that you were not requested by anyone to sign it? A. I wasn't requested by anyone to sign it particularly.

Q. You say "particularly?"- A. I wasn't by Mrs. Rader.

Q. I asked you this question awhile ago, whether you were requested by Mrs. Rader to sign it and you said you were not? A. Not by Mrs. Rader.

Q. I asked you whether she directed or requested anyone else to ask you to sign it? A. No, sir.

Q. There was no request came from her for you to sign that will? A. When he got that wrote Bruce asked me to come and sign it.

Q. He was managing the whole thing? A. Mr. DeJarnett was assisting some I think.

Q. Bruce wrote the will and took it to the bed to be signed? A. Yes, sir.

Q. And then he called you up? A. Yes, sir.

Q. Whatever you did you were requested by Bruce to do, is that right? A. I guess I was.

REDIRECT EXAMINATION.

Q. Mr. George, you said that when the will was prepared, written, that Mr. DeJarnett and Bruce went up to the bed and lifted her up there? A. Yes, sir.

Q. And she called for the pen? A. They gave her the pen, it seems as though, when they carried her the paper.

Q. You remained in your position? A. Yes, sir.

Q. State whether you were in full view of them or not? A. I was not.

Q. I don't mean whether you could see her, but were you in full view of the men? A. Yes, sir, but their backs were to me.

Q. You were in full view of them? A. Yes, sir, full view of their backs.

Q. And would have been in full view of her — A. If they had not been there.

Q. After they moved away from there and went back to where they were sitting, you were in full view of her? A. Yes, sir.

Q. You could see her and she could see you? A. Yes, sir.

Q. And you could talk backwards and forwards if you desired? A. Yes, sir.

Q. At the time you signed the will as a witness were you in full view where you could see her? A. I don't think I was.

Q. Why not? A. I may be and I may not. I never noticed where I was.

Q. Wasn't you in the same place? A. I was in the same room, of course, but the old lady had the things up by the side of her, pillows or something.

Q. If you had desired you could have seen her? A. Yes, sir, no doubt about that.

Q. Was there anything between you and her bed that would prevent you seeing her if you desired? A. Unless it was the stovepipe.

Q. Stovepipe? A. There was a small stove between. I wouldn't say for sure but I think there was.

Q. Here is the bed as you described it? (Showing witness a piece of paper.) A. There was a stove within two or three feet of the bed. Now this stovepipe might have been between her here and me.

Q. Which way was her head? A. West.

Q. If there was anything between you and her it was a stovepipe? A. I think that was all.

Q. What was the size of the stovepipe? A. I suppose six-inch stovepipe.

Q. At the time she was signing the will you were in the southwest corner? A. Yes, sir.

Q. And she was in the northeast corner? A. Yes, sir.

Q. Would the stovepipe be between you then? A. No, I think not.

Q. Then when you went to the table to witness the will you were sitting at the same table Bruce Rader was sitting at when he drew the will? A. Yes, sir.

Q. You first were sitting in the southwest corner of the room? A. Southwest.

Q. And she was in the northeast? A. Yes, sir.

Q. There was no stove between you then? A. When she got ready to sign the will I moved to where the stand was in this corner (indicating).

Q. At the time that you signed the will as a witness you moved over to the other chair? A. After I signed the will?

Q. When you went to sign it? A. I went over to where the stand was.

Q. Was that the same stand where Brace Rader wrote the will? A. I think it was. I won't say unless there were two stands there. I don't think it was changed. I think it was.

Q. The same stand? A. I think it was. I wouldn't say but what there might have been two stands.

Q. But your impression is that it is the same place where he wrote the will? A. Yes, sir.

Q. And same place where he was sitting when he was talking to his mother about the provisions of the will? A. Yes, sir.

Q. Now, Mr. George, at the time you were called on to witness this will had it been signed there? (indicating on will).

Q. Was that signature there? (indicating). A. I couldn't say that I noticed the signature.

Q. Mr. George, I show you the affidavit signed by you in the proof of the will before the probate court? A. Yes, sir.

Q. Was that testimony read over to you there? A. I guess it was.

Q. You can state whether you testified before the probate court that this will was signed by you as a witness and that you subscribed your name to it in the presence of the testator and at her request?

Q. Did you testify to that below, Mr. George? A. I don't remember about that.

Q. You don't remember? A. No, sir, I couldn't say that I remember about it.

### RECROSS-EXAMINATION.

Q. Mr. George, going back now to the room in which you all were at the time that this will was written, I want to ask you to state whether or not there was a closet on the east side of that room that extended out from the wall and just a piece outside of the bed where Mrs. Rader was lying at the time, a closet built under a flue, the flue extending from the closet up? A. There might have been.

Q. You don't remember about that? A. No, sir.

Q. And the closet extended out from the wall some distance and then there was a stovepipe that run into the same flue that closet was under, do you remember about that? A. No, sir, I don't remember.

Q. You don't say that there was no such thing there? A. I don't say either way, for I don't remember.

Q. You said at one time I believe that Mrs. Rader's head was turned to the west. I will ask you if you didn't mean her face was turned to the west? A. Do you mean when she signed this will or when she was lying down?

Q. When she was lying? A. When she signed this will her face was to the west; she was leaning over.

Q. Which way was she lying; which way was her head when she was lying down? A. It was to the east.

Joseph DeJarnett testified as follows:

Q. How far did you live from Mrs. Rader in 1899? A. I lived three quarters of a mile south and a hundred rods east.

Q. How long had she resided at that place? A. Ever since 1869.

Q. How long had you resided there? A. Ever since 1870.

Q. What relation were you to Mrs. Rader? A. Brother and sister.

Q. Do you remember when your sister died? A. Yes, sir.

Q. Do you know the date, Mr. DeJarnett? A. Well, I think she died on the 23d day of December.

Q. What year? A. 1899.

Q. Do you remember about the time she made her will? A. Yes, sir.

Q. Do you recollect the date of that? A. I think it was somewhere about the 16th of December.

Q. That same year? A. Yes, sir.

Q. Mr. DeJarnett, assuming for the purpose of this question that some document was signed there, I wish to ask you who kept the custody of it, if anybody, after that? A. Which?

Q. Just assuming for the purpose of this question that some document was signed at your sister's house? A. Yes, sir.

Q. On the sixteenth day of December? A. Yes, sir.

Q. Who, if anybody, kept the custody of that paper after she signed it? A. I kept the custody of one paper.

Q. Of one paper? A. Yes, sir.

Q. That is the paper I want to ask about just now. I show you a paper Mr. DeJarnett, that is a portion of Exhibit "A." It is a paper written on legal cap and the first line of it is, "In the name of God, Amen." At the end of it is a date, the sixteenth day of December, 1899. You may state whether that is the paper you kept the custody of? (Handing witness a paper.) A. I suppose it is, Mr. Lamm, that is my signature, anyhow.

Q. On the second sheet of this same Exhibit "A," I see a signature there "Jos. DeJarnett." State whose name that is? A. That is my name.

Q. Was it written by you? A. Yes, sir.

Q. Now, you may tell the jury who kept the custody of that paper after the sixteenth day of December, those two sheets that I have just shown you, the same being a portion of Exhibit "A?" A. Well, I kept possession of that paper myself.

Q. You say you kept possession of it? A. Yes, sir.

Q. When did you get possession of that paper? A. I reckon on the sixteenth day of December.

Q. Where did you get possession of it? A. At Mrs. Rader's.

Q. How did you come to take it into your custody? A. Well, sir, I suppose that I was appointed executor of that paper.

Q. You suppose you were? A. Yes, sir.

Q. State whether it was given to you to hold, and if so, who gave it to you? A. Bruce Rader gave me the paper.

Q. And you kept the custody of it ever afterwards? A. No, sir, not until ever afterwards.

Q. Well, until you did something with it? A. Yes, sir.

Q. Where did you take it—to your home? A. Yes, sir.

Q. What did you put it in—an envelope? A. Yes, sir.

Q. When did you put it in an envelope and where were you at the time? A. Bruce Rader put it in the envelope.

Q. Where was it put in an envelope? A. At Mrs. Rader's.

Q. What kind of an envelope? A. A white envelope, as well as I remember.

Q. What was done with the envelope? A. I suppose I handed it in with that sheet of paper.

Q. Handed it in where? A. Into the probate office.

Q. What did you do with the paper after it was

given to you at Mrs. Rader's? A. I took it home with me.

Q. And kept it how long? A. I don't remember.

Q. What did you do with it? A. I put it in the probate.

Q. Do you recollect the date at which you took it there? A. No, sir, I don't, Mr. Lamm.

Q. Now, Mr. DeJarnett, you say your name is signed to this document? (Handing witness a paper.) A. Yes, sir, I think that is my name, my signature.

Q. You know that is your signature? A. As well as I recognize it, I think that it is it.

Q. You see right above it Mr. George's name? A. Yes, sir, I see J. P. George's name.

Q. Did you see him sign the paper? A. No, sir.

Q. You didn't see him sign it? A. No, sir.

Q. What time in the day was it when this paper was signed by you? A. I don't know just what time it was, sometime in the forenoon.

Q. Forenoon? A. Yes, sir.

Q. Where did you say it was signed by you? A. At Mrs. Rader's house.

Q. In what room in the house? A. In the east room.

Q. By Mrs. Rader's house, who did you mean? A. I mean my sister.

Q. What was her name? A. Sister Lizzie.

Q. Was it Elizabeth R.? A. Elizabeth Rebecca, I think.

Q. Was Mr. George there that day? A. Yes, sir.

Q. How did he come there? A. I was asked to go and ask Mr. George to come over there.

Q. When were you asked? A. I don't know, the day before maybe. I just don't remember.

Q. By whom were you asked? A. Mr. Rader.

Q. Who do you mean? A. Mr. Bruce Rader.

We call him Bruce. I believe his right name is George but we call him Bruce.

Q. You have called him Bruce how long? A. All of his life.

Q. You say you think his right name is George? A. I think that is his right name.

Q. What makes you think so? His mother always called him Bruce, didn't she? A. Yes, sir.

Q. Who called him George? A. I suppose that is the name that was given to him.

Q. What makes you think so? A. Just from family records I think, the same as any other family.

Q. Did you ever see any family record that called him George Deneal? A. No, sir.

Q. You just heard that since this suit came up? A. No, sir, have heard that all my life.

Q. That his real name was George? A. Yes, sir.

Q. But have always called him Bruce out there? A. Yes, sir.

Q. Now, Mr. DeJarnett, had you been to town the day before this paper was signed? A. No, sir, not the day before I hadn't, I don't think.

Q. Had you been to town right shortly before that? A. Yes, sir.

Q. With whom did you come to Sedalia? A. How?

Q. With whom? A. I came with Bruce Rader.

Q. How did you come? A. In a buggy.

Q. State if there was anybody else with you? A. No, sir.

Q. Where did you go when you came? A. We went several places.

Q. Did you go to the probate office? A. Yes, sir.

Q. What did you get there, if anything? A. I didn't get anything.

Q. What was gotten there? A. I believe Mr. Rader got some papers.

Q. What was the paper he got? A. An abstract of a will.

Q. Some blank form of a will of some sort? A. Yes, sir.

Q. You were present when he got it?

Q. Were you present in the probate court's office when he got his abstract of a will? A. I think I was.

Q. You know you was, don't you? A. I think I was.

Q. What had you come to Sedalia for? A. I came on business.

Q. Whose rig did you come in? A. I came in my own.

Q. You came on business? A. Yes, sir.

Q. Did you come with reference to getting a form of a will? A. Not directly.

Q. Did you indirectly? A. Yes, sir, I did.

Q. Was it spoken of before you came? A. Yes, sir.

Q. Where was that? A. Over at Mrs. Rader's.

Q. When? A. I suppose a day or two before we came to town.

Q. Who spoke of it? A. I couldn't tell you who. It was spoken of, and if I shall tell it in my own way.

Q. Who was it spoke of getting the form or abstract of a will? A. There was something said, Mr. Lamm. I was over there to my sister's every few days, in fact I helped to build a shed on the barn, and who spoke I don't know.

Q. Who was present? A. There was two or three. My sister was there and Bruce Rader was there, and, I don't know, there might have been someone else.

Q. Who do you mean by your sister? A. My sister Donie.

Q. Was Mrs. Rader there? A. Yes, sir.

Q. Who did speak of it? A. I don't know.

Q. What is your best impression? A. My best impression is that someone, but which one I don't know.

Q. What was said there? A. I told them that I didn't know anything about wills and that I was opposed to wills.

Q. You were opposed to wills? A. Yes, sir, that I never knew any good to come out of one of them. That is what was said there.

Q. What else was said there? A. They asked me about this, and I told them I didn't know, that a probate judge drew up the only will that I ever knew anything about, and who was competent to draw up a will, and I told them I didn't know anything about it.

Q. Was there anything else said after you said something about a justice of the peace or probate court would know how to draw a will? A. I made the remark that I was going to town and Bruce Rader asked me how I was going, and I told him I was going in a buggy, and he asked me if he could go along, and I told him certainly he could go, and I knew nothing about making a will or anything of the kind and they could find out down there.

Q. Did you make the remark in the house there? A. I suppose I did.

Q. Have you stated all that was said there as near as you can recollect? A. I don't know as I have. That is the sum and substance.

Q. Well, having come to town with Bruce, having gotten an abstract of a will or something of that sort, how did you go home? A. Went home in the buggy.

Q. Was he with you? A. Yes, sir.

Q. What time did you get to Mrs. Rader's? A. I never went to Mrs. Rader's.

Q. Where did you leave Bruce at? A. At the cross lane. At the road that turns south to go to my house he got out and walked home.

Q. About what time was it? A. I suppose about sundown.

Q. When did you go to your sister's house? A. I think probably it was the day afterwards. It wasn't

the next day, it was the day following after we went
to town.

Q. You think a whole day had elapsed? A. Yes,
sir, I think so.

Q. In the meantime had you seen Mr. George? A.
No, sir.

Q. What was your object; what was the object of
your visit? A. To make a will.

Q. Who asked you to come? A. Bruce Rader.

Q. Where did you see Bruce Rader? A. Out
from town.

Q. On the road out from town? A. Yes, sir.

Q. Did you settle on the road out from town when
you were to come over? A. I suppose we did.

Q. You went over there? A. Yes, sir.

Q. And did you see Mrs. Rader when you went
over? A. Yes, sir.

Q. Was the will prepared on that immediate visit?
A. On what immediate visit?

Q. This one we have come to, the one the day after
you had been to town or the day after the day? A. Yes,
sir, I suppose it was.

Q. When had you gone to see Mr. George? A.
I went in the morning.

Q. That same morning you went over there? A.
That same morning I went over there.

Q. Was Mr. George there when you got over
there? A. No, sir.

Q. You spoke of this being in an east room? A.
Yes, sir.

Q. How large was that room? A. I suppose, Mr.
Lamm, it was fourteen feet square, maybe fourteen by
sixteen, I don't know. About fourteen feet square, I
think.

Q. Tell us what furniture there was in that room
as near as you can recollect? A. I can't tell you.

Q. As near as you can recollect? A. There was
a bed and a stove and a stand table and a large trunk,

as well as I remember. There might have been something else, I don't know.

Q. Any chairs? A. Yes, sir.

Q. You may state to the jury whether you all met in that room, Mr. George and all of you? A. Mr. George might have been on the place before he came into that room. I don't know about that.

Q. When you were all in that room? A. Yes, sir—

Q. Who was in the room? A. At what time?

Q. At this time, the time that you are there, the time when you came there? A. When I first went there in the morning I went by myself. Mr. George never went with me.

Q. When you got into the room who was there? A. When I went into the room I just don't remember who was in there, whether there was anyone in there or not with my sister. I don't remember about that, but I suppose there was, some one of the family probably.

Q. Did anybody else come in there after you got there— A. They might, Mr. Lamm. I won't say.

Q. Did you see Mr. George there? A. After he came I did.

Q. Where did you see him? A. I seen him in the room.

Q. Did you see anybody else in the room at any time? A. Yes, sir.

Q. Who? A. Bruce Rader.

Q. Did you see anybody else in the room? A. Not at that time I didn't.

Q. At the time this paper was prepared? A. No, sir.

Q. How many was there? A. There was four of us in the room.

Q. You and Mr. George and Bruce Rader and your sister? A. Yes, sir.

Q. Where was your sister? A. In bed.

Q. Was there any writing material there that you saw? A. Why, I don't know as I noticed any.

Q. Did you see a pen there during the day? A. I might. I might have seen a pen and I might not.

Q. Did you see anybody writing there during the day? A. I did that day.

Q. At the time you saw the writing what were they writing with? A. I suppose a pen.

Q. You saw the pen didn't you? A. I might and I might not.

Q. Did you see any ink there? A. I reckon I did. I don't know that I did.

Q. Where was this writing being done? A. Being done on the stand as well as I remember.

Q. By whom was it being done? A. By Bruce Rader.

Q. You were all in there when he was doing this writing? A. Yes, sir.

(By Mr. Steele): Who do you mean by "all?"

Q. You four? A. Yes, sir.

Q. You all four were there? A. Yes, sir.

Q. What had been said before he commenced doing the writing? A. Nothing that I remember of, Mr. Lamm, that I know of.

Q. You don't remember of anything being said at all? A. No, sir.

Q. What were you doing when this writing was going on? A. Sitting in the house, I suppose.

Q. Sitting there listening? A. I guess I was listening the same as any man always does.

Q. What did you hear? A. I didn't hear anything in particular that I know of.

Q. Nothing said at all while this writing was going on? A. Nothing said?

Q. Yes, sir, by anybody? A. I don't know that I said anything.

Q. Dropping you out, was there anything said by anyone? A. I reckon there was. I don't know.

Q. To the best of your judgment who talked while this writing was going on and what was said? A. There wasn't any talking going on except what was talked about in writing matters, I guess.

Q. Tell it as near as you can. If Bruce Rader did any talking, tell that, and if Mrs. Rader did any talking, tell that; tell it all? A. Mr. Lamm, as well as I know any questions that was asked were asked by Bruce Rader.

Q. To whom were they asked? A. A question might have been asked of me or it might have been asked of John George.

Q. It might have, but to whom was it asked? A. Just directly I just think, as well as my memory serves me, that the questions was asked his mother.

Q. What questions were asked his mother? A. Well, I don't know.

Q. As near as you recollect? A. Something concerning the will I reckon, Mr. Lamm.

Q. As near as you recollect? A. That is as near as I can recollect.

Q. All you recollect is that certain questions were asked about the will of his mother? A. Yes, sir.

Q. But you don't recollect what they were? A. In itemized form I don't.

Q. Give the substance of it if you can't give it seriatim and in itemized form? A. As well as I remember Bruce Rader when we were in there, and were ready to write the will I suppose asked his mother what he should put down first.

Q. And what did she say? A. That I don't know.

Q. Did she say something? A. If she did I don't remember it.

Q. What next did he ask his mother, if anything? A. I suppose some other questions about something concerning the children one way or the other.

Q. What reply did she make? A. How?

Hughes v. Rader.

Q. He asked her some questions concerning the children, and what reply did she make?

Q. Did she reply? A. She did, and some she never.

Q. How is that? A. As well as I remember.

Q. As you remember? A. Yes, sir.

Q. Could you tell what questions she didn't reply to? A. No, sir.

Q. Could you tell what questions she did reply to? A. I could to some of them in a general trend concerning—

Q. Give us those? A. When they would call the children's name and how much should be divided then she would say something.

Q. What would she say? A. Well, I suppose would answer him.

Q. State your best recollection of what answer she made to his questions, any of them? A. Well, my recollection is that when the questions was asked that she would answer them.

Q. How would she answer them? A. Answer them as he asked them.

Q. Answer them as he asked them? A. Yes, sir.

Q. What do you mean? A. He would ask her whatever it was he was writing. Whenever he would write down he would ask her questions.

Q. Then what would she say? A. That he would ask his mother when he put down the name of one child, I will say. Now what child came first or the name I don't know, don't just remember in the rotation how they came, but he would ask her and then go ahead, and she would, as well as I remember, she would say so much.

Q. What children were talked of there? A. What children?

Q. What children? A. His brothers and sisters.

Q. Name them here? A. I don't know as I can name them. I can name part of them.

Q. Name what you remember? (His question was what children were named in the will at that time.)

Q. Go on, Mr. DeJarnett. What children did they talk about, name them as near as you can recollect? A. I can tell the names of her children.

Q. I only want those that were mentioned there, as near as you can remember? A. There was Bruce Rader and Julia.

Q. Julia who? What is her name? A. I don't know. Fowland, I believe, and—

Q. And there is a man by the name of Giles Rader? A. Yes, sir.

Q. You don't remember what names were mentioned there? A. No, sir, not in rotation. Of course I know all the names when they are called.

Q. Mr. DeJarnett, there came a time I suppose when Bruce Rader quit writing. There was such a time as that? A. Yes, sir.

Q. What was done then? A. Well, I went home.

Q. Before you went home there was nothing else done at all? A. What?

Q. What was done with the very paper itself upon which he was writing, if anything? A. I don't know. The paper that I received?

Q. That is the paper that I am talking about? A. Bruce Rader put it in an envelope.

Q. Before it went into the envelope. When Bruce got done writing on this paper? A. I suppose we signed it.

Q. You know you signed it? A. Yes, sir. I didn't understand your question.

Q. You see that name right there? (Indicating.) A. Yes, sir.

Q. Mr. DeJarnett, I direct your attention to the first sheet that I examined you about before, the first sheet of this legal cap, and you see that name, purporting to be a name here, Elizabeth R. Rader? You see

that, do you? (Showing witness paper.) A. Yes, sir, that is Elizabeth R. Rader.

Q. Did you see that name signed there? A. No, sir.

Q. You don't remember of seeing that name signed there?

Q. Did you go to your sister's bed after Bruce was done writing? A. Yes, sir, I guess I did.

Q. You know whether you did or not? A. Yes, sir.

Q. What did you do there at the bed when you went there? A. I held my sister up.

Q. Who helped you? A. No one. I held her up.

Q. What did you hold her up for? A. Mr. Rader took a paper to the bed for her to sign.

Q. And you held her up? A. And he said she couldn't write lying down.

Q. Who said so? A. Bruce, I think.

Q. You held her up? A. Yes, sir.

Q. Did you keep holding her there? A. Yes, sir.

Q. What was she doing while you were holding her up? A. I don't know.

Q. Where were your eyes? A. In my head.

Q. Were you looking? A. Yes, sir.

Q. What were you looking at? A. I don't know what I was looking at.

Q. How long did you hold her there? A. I don't know.

Q. You could tell about how long you held her? A. I suppose three or four minutes, maybe not so long.

Q. Was there anything to write on there? A. Yes, sir.

Q. What was that? A. Some paper.

Q. Was there anything for the paper to lay on? A. I suppose there was, I don't know.

Q. Did you see it? A. I don't know that I did, Mr. Lamm, I reckon I did.

Q.  When you were holding your sister were you behind her?  A.  Yes, sir.

Q.  Your head was behind her back?  A.  Yes, sir.

Q.  Did you hear anything said while you were holding your sister up there?  A.  I don't remember as I did, Mr. Lamm.

Q.  I want to refresh your memory, that there was no ink on the pen?  A.  I might and I might not.

Q.  What is your best impression about that?  A. I don't remember.

Q.  You have no recollection about it at all?  A. No, sir.

Q.  Don't you know that you were holding her up there to sign something?  A.  Yes, sir.

Q.  What was it you were holding her up there to sign?  A.  I suppose a will.

Q.  When did you quit holding her?  A.  I don't know.

Q.  Why did you quit holding her?  A.  I reckon she was through.

Q.  That's it, how did you learn she was through? A.  I don't know.

Q.  Was this paper read out there at any time, either while it was being written or when it was through?  A.  Which?

Q.  Was this paper read there, either while it was being written or when it was through?  A.  I don't remember whether it was read or not.

Q.  Have you no recollection about that?  A. No, sir.

Q.  Did you see what you were signing?  A.  I never read it.

Q.  Was it read in your hearing?  A.  I don't remember it.

Q.  I am going to read this to you, and I want to ask you whether you remember this was read, this that I am about to read, "The foregoing instrument was at the date thereof signed and declared by said Elizabeth

R. Rader to be her last will and testament in the presence of us who at her request and in her presence and in the presence of each other subscribed our names hereto as witnesses to the same. This the sixteenth day of December, A. D., 1899.'' Was that read out to you there? A. I don't remember, Mr. Lamm.

Q. Where were you when you signed this paper? A. I was sitting at the table.

Q. What table? A. Little stand or something, table or a stand. I don't remember. It was in the southeast corner of the room.

Q. This same stand that you have been talking about hitherto? A. I don't know whether it was or not.

Q. Was there more than one stand in the room? A. I don't know.

Q. Did you see Bruce Rader writing on the stand? A. Yes, sir.

Q. What was he writing on? A. A stand.

Q. Was that the same stand that you used? A. Yes, sir.

Q. How did you come to sign it as a witness? A. That is what I was called there for.

Q. What did Mrs. Rader say, if anything, after you had understood she was through signing the will? Did she make any statement of any sort? A. No, sir.

Q. You are clear on that, she didn't make any statement at all? A. Nothing that I know of.

Q. In this statement that you signed in her presence you say that she requested you to sign this as a witness?

Q. Is that true, that statement that you signed there? A. She never asked me to sign it.

Q. You went before the probate court with this document? A. Yes, sir.

Q. Carried it there yourself? A. Yes, sir.

Q. How did Mr. George come to go before the probate court? A. I suppose he knew it was his duty.

Q. Did you tell him to come? A. I don't know whether I did or not, Mr. Lamm.

Q. You don't remember about that? A. No, sir.

Q. Did you meet there at the same time? A. No, sir.

Q. It was at different times? A. Yes, sir.

Q. Now then I wish to show you a signature on the third leaf of Exhibit "A." I refer now to that portion of Exhibit "A" which is headed, "Proof of will," and I wish to inquire if that is your signature to that proof of will there? (Handing witness paper.) A. Yes, sir.

Q. That is yours is it? A. Yes, sir.

Q. Where were you when you put your signature to that paper? A. To which?

Q. The paper that I just asked you about? A. I don't know. If that is the probate I was in the probate's office, I reckon.

Q. You know you signed it there? A. I suppose it is.

Q. It is the third sheet of what is known in this record as Exhibit "A" and this third sheet is headed "Proof of Will?" A. I suppose I was in the probate's office.

Q. Was this sheet read over to you before you signed it? A. Not that I remember of, Mr. Lamm. I don't know.

Q. Do you say it was not read over to you? A. Well, it was I reckon.

Q. You swear to it? You were sworn were you not? A. Yes, sir.

Q. You were sworn by whom? A. By the probate judge.

Q. Or clerk, which?

Q. I wish to read to you, Mr. DeJarnett, this, and ask you if you remember hearing this read to you— A. All right.

Q.  I read to you, Mr. DeJarnett,—   A.  Yes, sir.

Q.  "Be it remembered, That on this, the second day of January, A. D., 1900, before me, J. B. Harris, clerk of the probate court, held in and for the county and State aforesaid, personally appeared Jos. DeJarnett and J. P. George, who are the subscribing witnesses to the annexed will of Elizabeth R. Rader, deceased, and being by me first duly sworn, depose and say that the said Elizabeth R. Rader, the testatrix, subscribed the same in their presence, and published and declared said will or instrument of writing to be her last will and testament, and that at the time of signing the same she, the said testatrix, was of sound and disposing mind, and more than eighteen years of age, and that said deponents attested said will as witnesses thereto by subscribing their names to the same in the presence of the testatrix and of each other, and at the request of said testatrix."  Was that read to you?  A.  I suppose it was.

Q.  Did you sign it after it was read to you?  A. Yes, sir.

Q.  Did you swear to it after it was read to you? A.  I did under certain circumstances.

Q.  What were the circumstances under which you signed it?  A.  The probate judge asked me concerning my sister's sound mind, and I said, "In what sense do you mean that, what is it?" and he said, "She wasn't crazy, was she," and I said, "No, sir."  That is the time I signed that will.

Q.  Now that is with reference to soundness of mind.  Did you ask him anything whether you signed at the request of the testatrix or not?  A.  Did I ask him?

Q.  Did you say anything about that phase of this affidavit here?  A.  I don't remember; Mr. Lamm.

Q.  This is sometime ago.  Have you got a good memory?  A.  Not very.

Q.  You had a better memory as to whether Mrs.

Rader had asked you to sign this as a witness at the time you were before the probate court than you have now, haven't you? A. I don't know that it was.

Q. What do you say to that? A. Whether I have or not?

Q. Didn't you have a better memory about that one point, at least, as to whether Mrs. Rader had asked you to sign this as a witness, at the time you testified before the probate clerk, than you have now? A. I don't know.

Q. It was only some two weeks or so after the will was signed, wasn't it? A. I don't know just how long.

Q. It was shortly after she signed the will? A. Which?

Q. When you were in the probate court's office? A. Yes, sir.

Q. Well, Mr. DeJarnett, what in your judgment was the condition of your sister's mind on the sixteenth day of December, 1899? A. I didn't consider my sister's mind in as good condition, Mr. Lamm, as if she had been in her health.

Q. You think it was affected somewhat by sickness? A. That is my opinion.

Q. Had the doctor been there shortly before this will was executed? A. Yes, sir.

Q. You say you don't think she was in as good condition as if she had been well? A. No, sir.

Q. What condition was she in? A. She was in a very weak condition, Mr. Lamm.

Q. Physically? A. Yes, sir.

Q. What was the matter with her mind; state the facts? A. I am not a doctor.

Q. Do you know anything that was the matter with her mind? A. Nothing in particular, Mr. Lamm.

Q. You have narrated all she said that you remember, you have told all that she said that you can remember? A. I suppose I have.

Q. You didn't consider her of unsound mnid, did

you? A. I don't know what you would consider an unsound mind. I don't consider anyone in her condition in as sound mind as they are when they are in health.

Q. If you did consider her of unsound mind—taking it in your own way now— A. Yes, sir.

Q. Did she speak to you at all there that morning? A. I suppose she did, Mr. Lamm.

Q. She was awake? A. Yes, sir, I guess she was.

Q. Did she talk to you about anything? A. I don't remember. She might and she might not.

Q. Had you at any time talked with your sister prior to this time as to the disposition of her property? A. No, sir.

Q. A short time before? A. No, sir.

Q. Didn't you know before this will was made, from your sister herself, how she wanted to dispose of it? A. No, sir.

Q. Hadn't said a word to her? A. As I stated when we were coming down here to town—

Q. Did you learn before you came to town, from her, to the best of your recollection, how she wanted to dispose of her property? A. No, sir.

Q. Now, when you were coming to town with Bruce Rader didn't you say this or this in substance, to him, "I know how your mot.. ar wants to dispose of her property?" A. No, sir, I did not.

Q. Didn't you say this, that "if there is any will made I know how it will be made, the property will be cut half in two?" A. No, sir, I did not.

Q. Did you say anything in substance like that? A. No, sir, I never.

Q. In this talk before you came to town, in which you say you talked with your sister and Bruce Rader and your sister, Donie DeJarnett, as you recollect it, and in which you don't recollect who made the remark, whether it was your sister or not or who made any remarks, you may state if you didn't there learn, practically, the wishes of your sister Mrs. Rader, in regard

to the disposition of her property? A. No, sir, I did not.

Q. Then when this will was drawn there by Bruce as you have testified, and signed by your sister, that was practically the first time you ever knew of what disposition she wanted to make of her property? · A. Yes, sir.

Q. Your sister was a well-educated woman, wasn't she? A. Yes, sir.

Q. She was a graduate of Christian College at Columbia? · A. Yes, sir.

Q. A woman of strong and deep feeling and fine intellectual powers? A. She was a well-educated woman.

Q. And she had fine intellectual powers outside of that—strength of mind I mean— Isn't that a fact? A. I will let someone else say that.

Q. She had been a school teacher in her lifetime? A. Yes, sir.

Q. She was about sixty-one years old when she made this will, wasn't she? A. I guess she was.

CROSS-EXAMINATION.

Q. Mr. DeJarnett, you have known Bruce Rader and his brother Giles and the other members of your sister's family all their lives? A. Yes, sir.

Q. Lived right there by them? A. Oh, yes, sir.

Q. Mr. DeJarnett, you are perfectly friendly with all these children? A. · How?

Q. You are friendly with all these children— friendly with Bruce? A. Yes, sir.

Q. And Giles and the others? A. Yes, sir.

Q. You had been working, you say, a day or two, or two or three days before this matter of bringing up the will, helping build a shed at the house? A. Yes, sir, I helped put a shed over on the west side of the barn.

Q. At one time while you were there, and a day or so before the will was written, there was a conversation or something said about a will there in the house, is that right? A. Yes, sir.

Q. You don't know who it was mentioned the matter of a will, do you? A. No, sir, I don't.

Q. You do know that your sister never brought up the subject of a will—Mrs. Rader? A. I don't think she did.

Q. That is your best recollection about the matter? A. That is my best recollection.

. Q. I will ask you also, Mr. DeJarnett, if it is not your best recollection that it was Bruce who brought up the subject of a will there that day? A. I don't recollect.

Q. You don't say that it was not him? A. No, sir.

Q. But you just don't recollect who it was? A. No, sir.

Q. Mr. DeJarnett, your sister, Mrs. Elizabeth R. Rader, the deceased, the party claimed to have made this will, had been an invalid for quite a while? A. Yes, sir.

Q. She had a large tumor that had been growing for years that was located on one of her sides? Do you remember which side it was? A. I don't, but I think it was her right side. I won't say positive.

Q. Do you remember which side it was? A. No, sir, I don't.

Q. You couldn't tell whether it was the left or right side?

(By the Court): He said he thought it was the right side.

Q. You are not certain about its being in the right side? A. No, sir.

Q. I will ask you whether or not that tumor didn't

begin to grow and was the result of a fall that Mrs. Rader had some eight, ten or twelve years before?

Q. I ask you if you remember a time when she did have a fall? A. Yes, sir.

Q. That is a fall in a wagon or from a wagon here in Sedalia?. A. Yes, sir.

Q. How long was that before she died? A. I don't recollect how long. It was several years ago. She was sick quite awhile here in town.

Q. Here in town? A. Yes, sir.

Q. I will ask you if after that injury this tumor wasn't present and growing? A. Yes, sir.

Q. And continued to grow from that time until she died, or get larger, so far as you know? A. Yes, sir.

Q. You saw her frequently? A. Yes, sir.

Q. Several times every week? A. Yes, sir.

Q. I will ask you, Mr. DeJarnett, from the time that this tumor from the time of this fall and this tumor began to increase in size, whether your sister was the same in her conduct and actions and manner of speech to what she was before that? A. Well, I will say that my sister never was—she never had the same life about her that she had before.

Q. In regard to her manner and conduct state to the injury whether it was not entirely different? A. Well, I couldn't say whether there was any great big difference or not, but —

Q. Did she act the same as she did before? A. Well, no, sir.

Q. I will ask you whether or not her conversation and talk with you and others when you were present wasn't sometimes of a wandering character and nature, like an absent-minded person was talking.

Q. I want to know if you remember a time when your sister fell from a corn crib, had a fall a year or so before she died?

Q. I will ask you if it was reported to you that she was hurt? A. Yes, sir, she fell from a crib.

Q. Did you see your sister shortly after the time she sustained these injuries? A. Yes, sir.

Q. Where was she injured—in what part of her body and person? A. The last time she fell she was crippled —

Q. That is the time I have reference to? A. She was crippled in her ankle.

Q. Both her ankles? A. I think so, Mr. Cashman.

Q. I will ask you if the bone in one of her ankles wasn't broken and the other dislocated? A. I think that was it.

Q. Did you see her ankles after she was hurt? A. Yes, sir, I seen them.

Q. Tell the jury if they were not swollen and discolored? A. Yes, sir.

Q. And she was confined to her bed? A. Yes, sir.

Q. And she suffered intensely or appeared to? A. Yes, sir.

Q. And was moaning and groaning and you saw it in a plaster-of-paris cast after she was hurt? A. Yes, sir.

Q. How long was your sister confined to her bed, if you know, at the time she sustained these injuries to her ankle? A. I couldn't say just how long, but quite a while.

Q. I will ask you now if ever after that, up to the time of her death, she wasn't in the habit, when conversing with a party, of talking first about one thing and without any apparent cause or reason to change the subject and drift on to something else entirely disconnected, and if that wasn't her habit of talking prior to the time she was hurt the first time? A. Well, I don't know as I just understand that question.

Q. Was she in the habit of talking in a wandering way, disconnectedly, incoherently?   A.   I don't know that I ever noticed it particularly.

Q. Did you notice it after she was hurt that last time?   A.   I have noticed at several different times that her appearance wasn't the same.

Q. I have reference to her manner of talking and her conversation?   A.   That is what I have reference to, that her manner of talking wasn't the same as it used to be in younger days.

Q. State in what it was different than it was before she was hurt?   A.   I don't know as I can state.

Q. I will ask you if she didn't talk disconnectedly, that is, while talking about one thing, without any apparent reason, get off on to something else.

Q. I will ask you if that didn't frequently occur? A.   Well, I don't know, Mr. Cashman, whether it did or not, to my just particularly noticing it.

Q. Do you know how long your sister had been confined to her bed in her last illness?   A.   No, sir, I don't.

Q. Several weeks?   A.   Oh, she was there several weeks.

Q. You remember the time that her husband died? A.   Yes, sir.

Q. That was in August prior to her death?   A. Sometime about August or September.

Q. Latter part of July?   A.   Yes, sir.

Q. The seventh of July? You remember that?   A. Yes, sir, it was along about July.

Q. I will ask you if she wasn't taken down sick and confined to her bed just after her husband's death. A.   Well, I think she was.·

Q. As a matter of fact she was confined to her bed right after her husband died?   A.   Yes, sir.

Q. For quite a little while?   A.   Yes, sir.

Q. I will ask you if it is not a fact, and don't you know it as a fact, that she was so sick and feeble that.

she was unable to attend the funeral of her husband?
A. Yes, sir.

Q. You were there present? A. Yes, sir.

Q. She was frail and weak from that time on until she died, wasn't she? A. Yes, sir.

Q. And grew worse all the time? A. Yes, sir.

Q. This tumor, you felt of it yourself at different times? A. Yes, sir.

Q. She suffered greatly from it? A. Yes, sir, she did.

Q. She was taking morphine and opiates, you know that, don't you, to relieve her pain? A. Well, I don't know that.

Q. You don't know that yourself? A. No, sir.

Q. How large was this tumor or this swollen part on her body? A. The last time I remember of noticing it was, oh, I suppose something like the crown of a hat.

Q. I will ask you if it was not as large as the crown of a hat? A. I said it was something like the size of the crown of a hat.

Q. That tumor showed on the outside of her body? A. Yes, sir, as well as I remember.

Q. You saw it several times? A. Yes, sir.

Q. •How long before she died was the last time you saw or examined that tumor? A. I couldn't say, Mr. Cashman, just as to the time, but it was sometime, oh, probably a week or something like that; may be not any longer than that, or it might have been longer.

Q. Your sister in her health and vigor of life was a woman of ordinary stature and build and size? A. Yes, sir.

Q. As this tumor enlarged, I will ask you if she didn't grow very frail until at the end she was a mere skeleton? A. Yes, sir, she growed frail.

Q. I will ask you if she didn't simply grow to be a mere skeleton, nothing apparently but skin and bones left? A. That was her condition.

Q.   Her face was emaciated, her eyes hollow and sunken, there at the latter end— A.   Yes, sir.

Q.   And at the time this will was drawn, isn't that right?   A.   Yes, sir.

Q.   She was so weak that you were compelled to hold her up at the time this will was presented to her for signing?   A.   Yes, sir.

Q.   Her eyes there on the day this paper was presented to her, as you stated in your direct examination, they were sunken back in her head and were glassy and had the appearance of approaching death to you, didn't they?   A.   They had the appearance, she did, her general appearance in every way, manner or form that anyone could look at anyone was that she was in an awful weak condition and wasn't long for this life.

Q.   And just such a one as would be liable to die at any time?   A.   Yes, sir.

Q.   She died in seven days from that day?   A.   I don't remember the number of days.

Q.   She died on the twenty-third?   A.   Yes, sir.

Q.   And this was on the sixteenth?   A.   Yes, sir.

Q.   I will ask you if there on that day when that will was written if she didn't lay there apparently unconscious of what was going on about her?   A.   Yes, sir.

Q.   She never spoke a word to anyone except when she was spoken to, did she?   A.   Not that I know of.

Q.   You were there all the time during the progress of the writing of this paper?   A.   Yes, sir.

Q.   And the taking to the bed of the paper and the signing of it by you and Mr. George?   A.   Yes, sir.

Q.   You were there all the time?   A.   Yes, sir.

Q.   And never left the room?   A.   No, sir.

Q.   For a moment?   A.   No, sir.

Q.   Now I will ask you whether it is not a fact, Mr. DeJarnett, that she never said a word about what should go into that will except when Bruce asked her something about a dollar apiece going into the will to some-

body and she made a response to it? A. Well, that is my best recollection.

Q. Bruce asked her something about a dollar for some of the parties going into that will, is that right? A. Yes, that is my best recollection.

Q. And she gave some response, and you don't know what it was, isn't that right? A. Yes, sir, she answered.

Q. You don't remember what her answer was in words? A. No, sir, I don't, Mr. Cashman.

Q. As a matter of fact, Mr. DeJarnett, you don't know whether the question that Bruce asked her wasn't with reference to himself and his sister Julia; you don't know now but what it was referring to their own names and themselves? A. Well, I don't know that I could say what names was called first.

Q. You don't remember about that? A. No, sir.

Q. How long was Bruce occupied in writing that paper? A. Oh, I suppose two or three hours and maybe an hour. I mean an hour or two or three hours. I don't just remember. Maybe not any longer than half an hour.

Q. The room was about fourteen feet square? A. Yes, sir.

Q. She was in the bed in the northeast corner of that room? A. Yes, sir.

Q. Her head was turned to the east? A. Yes, sir.

Q. There was a flue that was built from the second floor of the house through the room with a closet built under it in that room on the east side and just a piece outside of her bed, wasn't there? A. Yes, sir.

Q. Do you know the size of that closet? A. No. sir; about the size of a common flue.

Q. And the closet was built under it? A. Yes, sir.

Q. And outside of that closet was a stove? A. Yes, sir.

Q. And a stove extended up and went into the flue? A. Yes, sir.

Q. Her head was at the east end of it? A. Yes, sir.

Q. The stand table at which the writing was done was in the southeast corner? A. Yes, sir.

Q. Standing against the wall and in the corner? A. Yes, sir.

Q. Bruce, in writing that will, had his back turned which way, do you remember? North or west? A. I think to the west, Mr. Cashman.

Q. To the west? A. Yes, sir.

Q. And facing east? A. Yes, sir.

Q. When you signed the will which way was your face turned? A. To the east.

Q. Same way? A. Yes, sir.

Q. You don't remember of seeing Mr. George sign the will? A. No, sir.

Q. You were there together? A. Yes, sir, we were there together.

Q. You didn't see your sister sign the will, did you? A. No, sir.

Q. You standing leaning on the bed and back of her, holding her up? A. Yes, sir.

Q. You were just behind her. You didn't notice what Bruce was doing. Bruce came over there with some paper and a book, so far as you remember. Do you remember about a book being over there? A. No, sir.

Q. You don't remember what arrangements he had for her to sign there? A. No, sir.

Q. How was her head when you were holding her up? Did she rest back on you or against you in any way? A. I suppose—Mr. Cashman, I don't know.

Q. Mr. DeJarnett, Bruce finally moved away from the bed, took the paper away? A. Yes, sir.

Q. Then you laid her down? A. Yes, sir.

Q. And when you laid her down you laid her right on her back? A. Yes, sir.

Q.   There was a soft pillow on the bed?   A.   Yes, sir.

Q.   Was her head sunk down in that pillow?   A.   I couldn't say that I noticed that.

Q.   Mr. DeJarnett, Mrs. Elizabeth R. Rader, your sister, whom it is claimed made this will, never requested you or Mr. George in your hearing at any time there that day to sign that paper, did she?   A.   No, sir.

Q.   Did she request you prior to the time you went there to sign her will?   A.   No, sir.

Q.   Did she at any time request you to sign her will?   A.   No, sir.

Q.   The only way anybody was asked to sign this will was by Bruce Rader?   A.   If anyone ever did.

Q.   And is the only one, if anyone ever did?   A.   I suppose so.

Q.   That is your best recollection and judgment about it?   A.   I don't remember of anyone asking me.

Q.   Bruce, as far as you recollect now, never asked you to sign it there that day, did he?   A.   No, sir.

Q.   He never asked you at any time in the presence of his mother to sign that will, did he?   A.   No, sir.

Q.   Never did?   A.   No, sir.

Q.   You can't tell this jury whether Mrs. Rader, your sister, could see you and Mr. George or either of you when you signed that will there at the stand table that day?   A.   No, sir, I can't.

Q.   When you laid her down on the pillow, she was lying right on her back, and that was the last position you saw her in after Bruce took the paper away from her?   A.   Yes, sir.

Q.   When you went over to that stand table to sign that paper you didn't look to see whether she was looking at you or not?   A.   No, sir.

Q.   And you don't know whether she was looking at you or not?   A.   No, sir, I don't.

### REDIRECT EXAMINATION.

Q. Mr. DeJarnett, how many years ago was it that you understood your sister had this fall in Sedalia? A. I don't recollect how many years, Mr. Lamm.

Q. About how many, Mr. DeJarnett? A. Probably five or six or seven years, maybe a little longer and it might not have been quite so long. It was quite a while, though.

Q. You say she was sick a little while from that? A. She was sick all the time up to her death.

Q. She was sick in Sedalia after that? A. Yes, sir.

Q. How long? A. I don't just remember.

Q. Didn't she get up and go around after that? A. Yes, sir.

Q. She transacted her own business after that? A. I don't know.

Q. Do you know of her buying cattle? A. No, sir.

Q. You don't know anything about that? A. No, sir, I don't.

Q. You say she never was the same after that. Just what do you mean by that; describe in your own language what you mean by saying that she wasn't the same? A. Well, Mr. Lamm, as people grow old and—anyone that is feeble, in bad health, and growing old isn't the same when they are otherwise and young and not in bad health.

Q. That is what you mean, isn't it? A. Yes, sir.

Q. In the first place, she looked older in her face? A. Yes, sir.

Q. How is that? A. Yes, sir.

Q. And when she was in bad health the sickness that she had changed her expression somewhat? A. Yes, sir.

Q. On her face? A. Yes, sir.

Q. Who would mention the amount? A. Mr. Lamm, I couldn't say.

Q. Did you say that Bruce mentioned it? A. No, sir.

Q. Who would name the heirs? A. Well, I couldn't tell you that.

Q. Do you say that Bruce would name the heir? A. No, sir, I don't.

Q. You think that he was as much as two hours drawing that will? A. I didn't say that. I said he was from half an hour to two or three hours. It might not have been so long.

### Recross-Examination.

Q. Isn't it a fact and don't you know that she wasn't in a condition to know and understand what she was doing at all? A. I said that I thought I didn't consider my sister in a condition to make a will.

Q. I will ask you whether or not you don't know that she wasn't in a condition to know and understand the situation and location and value of her property, the relationship of those that were entitled to her bounty naturally; I will ask you if it is not a fact in your opinion she was in a condition not to understand these things fully? A. I don't think she did.

Q. You said that when this matter came up in the probate court or before the judge or clerk, when Mr. Parsons read this proof of will over to you— A. Yes, sir.

Q. You asked him to what extent that meant, as to her condition? A. Yes, sir.

Q. And he told you that it just simply meant, or in substance this, inquiring as to whether she was crazy or not? A. Yes, sir.

Q. I will ask you if you had not declined to sign that until that understanding was given you in regard to this paper? A. That is what I asked the question for.

Q.  And didn't you at that time inform them that she wasn't capable of making a will and wouldn't sign it unless it went only to the extent of her being crazy?  A.  I don't know that I said that, but I asked him if that meant the condition of her mind and all, and he said, "She wasn't crazy, was she?" and I said, "No, sir."

Q.  And he just answered that that was all there was to it?  A.  That is all there was too.

Q.  I will ask you whether or not at this time this paper that Mr. Lamm presented to you, and which is attached and is a part of Exhibit "A," introduced in evidence, and having a heading, "Proof of Will," with your name signed to it—that is a printed form with blanks filled in, isn't it?  A.  Yes, sir.

Q.  That was read over to you hurriedly there that day?  A.  Yes, sir, it was read to me.

Q.  You didn't read it over?

(By Mr. Lamm):  Wait a moment.  What were you going to say?  A.  He asked me if it was read to me.

(By Mr. Lamm):  No, sir, he asked you if it was read hurriedly.  A.  I said he asked me if that was read over to me hurriedly that day, and I told him that it was read to me.

Q.  You didn't read it over yourself, did you?  A.  No, sir.

Q.  But the moment you heard it read over you hesitated about signing it?  A.  Yes, sir.

Q.  And asked its meaning?  A.  Yes, sir.

Q.  And the judge of the probate court himself told you its meaning before you signed it?  A.  Yes, sir.

Q.  And that it was a mere matter of form and it only went to the extent of saying whether or not she was crazy?  A.  Well, the question that I asked there was to inform myself before I signed any documents to see what I was signing, and I signed a mere form as I understand now, that I wasn't signing this, that

she was in her mind, that I didn't consider her in a right condition.

Q. I will ask you if Mr. Parsons didn't state to you that she wasn't crazy and it was a mere matter of form? A. That is what I told him. I wanted to know, and he says, "She wasn't crazy, was she?" and I said, "No, sir."

### Redirect Examination.

Q. You have stated now that you didn't think your sister capable of making a will at the time she made it. Upon what facts do you base that conclusion? A. Just on general debility. I don't consider any person in feeble health—. I based it on because I didn't think her mind was in as good condition when she was sick as it was.

(We ask your Honor to indicate by his ruling—we don't want to break over the ruling at all—just what the extent of your ruling is in regard to this. Our theory is that this witness is simply testifying as to his general convictions. Everybody has convictions, and one of his ideas is that a person that is sick has no right to make a will, and now we want to show that he entertains those views, and then our next question will be that those convictions are what caused him to come to the conclusion he does with regard to his sister.)

(By the Court): The court will suggest that you can ask this witness upon what he bases his conclusion that his sister was not in a condition to make a will. You can ask that question and then let him answer.

Q. Upon what facts do you base your conclusion that your sister was not in a condition to make a will? A. I just simply base it on I don't think she was.

Q. From what facts did you draw that conclusion? A. From the condition her health was in.

Q. That is her bodily health? A. Well—

Q. Do you mean her bodily health? A. In every respect.

Q. She was sick in body? A. And I suppose in mind.

Q. Mr. DeJarnett, what was there said there, if anything, to indicate that your sister did not know what property she possessed? A. There was nothing said there to indicate it that I know of.

Q. Upon what do you base the fact then, adopting the court's suggestion, upon what do you base your conclusion that she did not understand who her heirs were and the objects of her bounty? A. Mr. Lamm, I suppose she knew her children.

Q. Upon what do you base your conclusion, if you have such a conclusion, that she did not understand the extent of her property and what she owned? A. Just her condition, Mr. Lamm, that she was in.

Q. What was the general condition? A. She was broke down in body and mind as I consider both.

Q. What did she say there which indicated that she did not know? A. I don't know that she said anything.

Q. Now you say you are perfectly friendly with Bruce Rader? A. Which?

Q. You say you are perfectly friendly with Bruce Rader? A. Do you mean perfect? I am friendly with Bruce Rader.

Q. Are you friendly with Bruce Rader? A. Yes, sir.

Q. What do you mean by being friendly? A. Just the same as I would be friendly with any man.

Q. You have had no trouble with him since this will was signed, of any sort? A. Yes, sir.

Q. You have had? Didn't Mr. George W. Barnett, one of the attorneys for defendants here, send for you as one of the subscribing witnesses to this will to come to his office in Sedalia? A. He wrote me a note asking me to call at his office.

Q.  Didn't you go there and didn't he say to you in substance this—  A.  Yes, sir.

Q.  We are obliged to put you on the witness stand? A. Yes, sir.

Q.  As a witness?  A.  Yes, sir.

Q.  The law requires it?  .A.  Yes, sir.

Q.  And we want to know what you know about the facts in this case?  A.  Yes, sir.

(We offer to show that he refused to talk to the attorneys for the defendants in the case and would not permit them to interrogate him with regard to what facts he knew in this case, and we were obliged to put him on the witness stand without knowing those facts.)

Witness excused.

### DIRECT EXAMINATION.

Q.  Mr. DeJarnett, on this occasion as I understand you to say, you don't think your sister was in a fit condition to make a will, is that right?  A.  I said I didn't think her mind was clear.

Q.  As clear as what?  A.  As anyone's mind should be to make a will.

Q.  Is that what you said before dinner?  A.  I don't just remember.

Q.  Didn't you put it on the ground of her being sick, before dinner?  A.  That would include this too.

Q.  Now I ask you this question, whether you don't believe in the doctrine or in the theory that a sick person hasn't got a clear enough mind to make a will? A.  I don't think they have got as clear a mind when they are sick, in feeble condition, sick enough.    Of course a man can be sick and be all right, but I mean a very low condition.  I don't think his mind is capable of making a will as when he is in perfect health.

Q.  Following that up, is what you mean this, that your sister was sick and therefore she wasn't as capable of making a will as when she was well, is that what you mean?  A.  Yes, sir.

Q. That is what you mean? A. As she was when she was in her health.

Q. You mean to tell the jury that if she had been well and in her health she would have been more capable of making a will then if she was in that condition? A. Yes, sir.

Q. That is all you do mean by that from beginning to end? A. Yes, sir.

Q. Going over this matter in detail in regard to her mental condition there, she didn't say anything or you didn't see anything there that indicated that she didn't have all her children in her mind or that she didn't remember them all did you? A. No, sir.

Q. You didn't see anything there or you didn't hear anything that indicated that she wasn't capable of understanding that she owned land and property, did you? A. There wasn't anything said.

Q. How is that? A. There wasn't anything said.

Q. How is that? A. I said I didn't hear anything said that indicated that.

Q. That she didn't understand that she owned land and property? A. Yes, sir.

Q. Before dinner you spoke something about age, the age had something to do with it, that a person as old as she was and as sick as she was wasn't as capable as when they were younger and were well? A. I said I suppose that as anyone growed old and was in bad health, very bad health, that it would affect their mind more so than if they was young in the same health.

Q. The older a person gets the less capacity they have for making a will, is that your theory? A. No, sir, not when they are well and in their general health.

Q. But if they are old and sick together then your theory is that those two things combined ought to incapacitate them from making a will? A. I suppose that it would some.

Q. You suppose it would some? A. I say I suppose the age would have something to do with it.

Q. Something to do with it?  A.  Yes, sir.

Dr. Samuel Conway, an experienced physician, the family physician of Mrs. Rader of long standing, and the only medical witness, after explaining her physical ailments as he saw them on December 14, 1899, said that she talked to him a good while and seemed bright and understood what she was talking about. She seemed to be in sound mind, was emaciated, but there was no indication of delirium. There was nothing in her physical suffering which would affect her mind. On the eighteenth of December, at his next visit, she was in a great measure over her stomach trouble and he saw no difference in her mind. She was capable of understanding who her children were, who were depending on her, what her property was, what she was doing and what disposition she was making of it; he saw not much difference in her mental condition in his two subsequent visits. She was a bright, intelligent woman, rather above the average, and she continued that way as long as he knew her, she talked a good deal every time he went there.  On cross-examination witness said he thought the tumor she was suffering with was of a cancerous nature, it would result in physical powers being weakened, but you can not detect any mental change. "I think," said witness, "she continued bright as long as I knew her." She died from the tumor, from exhaustion. Witness said the general rule was that the mind in that form of disease was not necessarily affected. It was not the witness's experience. People will frequently come down gradually and so far as one can tell their minds are not very much affected. As a general rule their minds are affected less than in any other disease; in this cancerous affection there is no direct connection with the brain or anything of the kind.

Bruce Rader, one of the defendants, testified. He stated substantially that his mother's mind was clear to the last, that she attended to her business, rode to

Sedalia and bought cattle up to a very short time before she died. It was further shown by this witness: That on or about the fourteenth of December, Joseph DeJarnett called at Mrs. Rader's house and there advised the calling in of a doctor; that Mrs. Rader, doubting any permanent relief, consented and then said to Jos. DeJarnett that she wanted him and Bruce to get a blank form of a will the next day, and that as soon as possible she wanted her will made; that she felt that she was not going to live long, and, whether she did or not, she wanted her business fixed up. Accordingly, on the next day, Mr. DeJarnett and Bruce went to Sedalia, and on their way there, on the suggestion of Mrs. Rader, about the will, the witness wanted to go to John R. Clopton (the record shows that Mr. Clopton was the business adviser and a cousin of Mrs. Rader and had been a long time public administrator of Pettis county), but Mr. Jos. DeJarnett objected and said, "We will go to the probate judge;" that they did so and got there a form, or, in other words, the heading and attesting clauses of a will; that Joseph DeJarnett took this form home with him and that after the will was signed Joseph DeJarnett carried away the blank form, together with the will, and witness saw it no more. That on parting that evening, Mr. DeJarnett agreed to bring Mr. George, or Mr. Kemp, over in the morning; that the question of expense was considered by the mother and that it was to avoid this that the mother insisted upon Bruce doing the writing of the will; that Bruce demurred, but finally consented, and the writing was done in the presence of Mr. DeJarnett, Mr. George and his mother, in a room at his mother's house the next day. When they were all met there for the purpose, the preparation of the will was commenced by suggestion from Mr. DeJarnett, who said it was time to begin, whereupon the mother said, "Bruce will write the will," and the work was begun. Bruce Rader never requested his mother to make a will and never corresponded with

Mr. Fowland on the subject. Upon cross-examination he admitted having difficulties with his father, and that he had misappropriated funds of his father's estate; that he had received the letter from his sister, the co-defendant, Mrs. Fowland, addressed to his mother; that he opened it and read it to his mother. He stated that he could not find the letter to produce it. Then followed with a statement as to the contents of the letter admitted; that he knew the address of his sister, Mrs. Puntney in Kansas, where Giles, his brother, was; that he did not notify his sister or brother of the approaching death of his mother.

Mrs. Fowland, one of the defendants, testified:

That on the request of a neighbor woman, Mrs. Glass, she came home from Jasper county on the twentieth of December. She knew nothing of the making of the will till after it was made. She was with her mother continually and could see no change in her mother's mind, it was perfectly sound. She testified that her mother died on Saturday, the twenty-third of December, at eleven o'clock a. m. She testified that Giles Rader came to her home in November, 1899, and that because he could not get a check on the Sedalia bank, he wrote a check on a blank of a Webb City bank and gave it to her groceryman; that this check was for $10; that she wrote a letter to her mother and told her that Mr. Betts had been to her house with the check for $10, given by Giles, and it was on the Webb City bank and he wanted me to cross the Webb City bank out and change it to Sedalia, and I told him that I wouldn't do it, and I wrote to her that I knew she hadn't authorized him to do these things, to give checks on her. I intended to write to her that the check was for $10. I didn't say anything else in regard to the check. That at the same time she wrote a letter to her brother Giles to Newton, Kansas. This witness admits that in writing to her mother about the $10 check she might have written the letters that the check was for $100 and that

she had stated in the letter she knew her mother had not given Giles authority to sign her name to checks. She states that on the afternoon of the day she arrived at her mother's home, the twentieth, Bruce told her the property was divided in two halves. Witness was with her mother from the day of her arrival, December 20, to the day of her death, December 23. She knew that Giles was at Newton, Kansas, with her sister, Eulalia Puntney. That her sister had been living at Newton, Kansas, for years; that she had received a letter on December 18 from Mrs. Glass telling her that her mother was bound to die; that in response to this letter she came to her mother's home; that immediately upon the death of her mother, the same morning, she wrote a letter to her sister and brother at Newton, Kansas, notifying them of her death.

Miss Dona DeJarnett, a sister of the testatrix, testified in support of this will; she had lived quite a while with Mrs. Rader. Her testimony may thus be summarized: She went there early in December and was there when the will was written, December 16, which was on Saturday, but as Saturday was Miss DeJarnett's Sabbath, and she kept it sacred, she was not in the room when the will was written, and took no part. She talked with her sister on religious and many other subjects during her last illness. Mrs. Rader talked as she always had talked, bright. Miss DeJarnett suffered with headaches and Mrs. Rader would read to her out of the Bible and out of papers. "Q. In her conduct and discussion of the questions that she talked about, how did she talk, rationally, intelligently or otherwise? A. Just as she always had done. Q. How was that? A. It was always rational." When Dr. Conway called her mental condition was just as it had been. She saw her and conversed with her the forenoon before the will was made and her conversation was the same as usual. Her mind was sound and continued so to her death a week later. She was capable of understanding

what disposition she wanted to make of her property. Her sister never mentioned the word "will" to her, but she knew of her testamentary disposition. It first came out when Giles wronged his mother in a business transaction. Witness never advised her sister about making a will.

John R. Clopton was the business adviser of Mrs. Rader, a relation and an unusually experienced man of affairs, having been public administrator of Pettis county for twenty-four years, and by him it was shown that she was to see him in Sedalia about four weeks before she died and he met her frequently in town and consulted her on business. She was, said the witness, one of the smartest business women he knew of in the country and had the best education. Her mind was good up to the last time he saw her. The last visit shortly before her death she came to witness's house and he spent part of the day with her talking over the affairs of her husband's estate and matters of that kind. (Witness helped Bruce Rader superintend the husband's estate.) Her mind on this visit was good, "as bright as I ever saw her, I think," said the witness.

Upon cross-examination, Miss Dona DeJarnett testified that her sister, Mrs. Rader, had been ill for a long time, was quite weak and thin. She further stated in answer to questions: Q. Did you have any conversation with Mr. Joseph DeJarnett immediately after the execution of the will? A. The morning the will was made he came into the kitchen where I was, and he was sitting by the stove warming himself, and he seemed to be in trouble, and he says, "I am going to do something that I don't feel that I ought to do," and I said to him, "What's the matter?" and he said he didn't think it would be satisfactory the way she was going to make her will. Q. Said what? A. He didn't think it would be satisfactory the way she was going to make her will; he thought it would cause trouble. Q. What further was said with regard to her condition? A. Yes, I said

"Do you think she is going to do wrong?" He says, "No, I can't say that; it's her own and she has a right, and she understands her own business." I don't know that that was exactly the words, but that was the meaning. Q. Did he say anything about the condition of her mind; what she was doing? A. He simply said she understood her own business.

On the part of the plaintiffs a number of witnesses testified. Joseph Monroe DeJarnett testified that testatrix was his aunt; that he lived but a half mile from her in her lifetime. That he was well acquainted with her. That a short time before she died he was over at Mrs. Rader's house, and talked with Miss Dona DeJarnett, and this was said: "I went in the kitchen and my aunt, Miss Dona DeJarnett, was in there, and I told her I had received a letter from Giles asking how his mother was and I had come up to see, and we talked there awhile, and then she told me, she asked me where Giles was at, and I told her Newton, Kansas." "Q. Who was present at this conversation? A. I was talking to Miss Dona DeJarnett, and she wanted to know where Giles was at, and I told her Newton, Kansas, and she said they had received a letter the day before stating that he had left her there and gone to Colorado and that he had forged a note on the Webb City bank for one hundred dollars and the sheriff was after him. Q. Did she state from whom? A. From Julia Fowland. Q. Go ahead. A. Then she told me that she would advise me not to write to him, that there was a will on foot and they didn't want him there. There is a will on foot and you keep out of it."

This witness further testified about a conversation with Bruce Rader in respect to a fight Bruce had with his father and also as to improper language used towards his mother.

Willis DeJarnett simply testified that on one occasion he heard Bruce curse his mother, the testatrix.

Mrs. Eliza DeJarnett testified partly as follows:

I went to see Mrs. Rader at her home some time the last of October, 1899, and stayed all night. She told me that she intended to run the farm herself and that she intended Giles to have half of what was made on that farm but that Bruce would not let him stay there, but he could put a hand there and get half that was made there. She went to Sedalia alone and I scolded those boys for letting her go in the condition she was in, and I told her I didn't think she ought to have done it, and she told me not to scold those boys, that she wanted to go alone and she didn't want them to know her business, and that she wanted to put Bruce out of that administrator business after he had ruined her and my son. She spoke of Giles, seemed to be in trouble about Giles, about his health, and said he and Bruce didn't get along and he wouldn't let him stay. She spoke of Giles in the highest terms.

On cross-examination: When she told me about these things we were both in the buggy. I took her in my buggy and took her about a half mile to my sister-in-law's and we both took dinner there together, and on the road between her home and there she told me, because she didn't want anybody to hear what she told me. She seemed to think he (Bruce) spent too much money and would not be able to make it up and they (the bondsmen) would have it to pay.

Thomas Jefferson DeJarnett related a conversation with the testatrix in which she was complaining of Bruce spending too much money and expressed some apprehension that she would suffer by reason of being on his bond.

A. G. Pemberton said her mental condition was affected by reason of a hurt she received, and related the trouble between Bruce and his father; it can serve no useful purpose to reproduce his statements. He further stated that: She (Mrs. Rader) told me that Giles was in bad health and wasn't able to work. She said, "He is away from home but I intend to take care

of him.'' That was just before she took down. She has often said that to me.'

Mrs. A. G. Pemberton testified partly as follows:

Knew Mrs. Rader for the last thirty-two years. Lived close neighbors since 1868, and never had any trouble; were intimate friends. Did not think Mrs. Rader's mind was the same since the time she was hurt in Sedalia many years go. I could see a difference in her conversation, and I think her mind went with her body, with her physical condition. Just before she died, ''Well, she was just as poor as any person I ever saw, and weak. I can't hardly express— as any person I ever seen. For a week or two weeks before she died she was very weak. We had to raise her up.''

Again: Witness, in detailing the conversation with Dona DeJarnett, said, ''She (Dona) went on and told me that Giles had forged this note at Webb City. They had got a letter from Julia stating that Giles had forged a note at Webb City for $100 and that he was then gone to Kansas to Eulalia's and the sheriff was after him.''

Again: Well I was over there (at Mrs. Rader's), it was after Giles left home, after he went away, and she had a letter laying on the bed. She said she had just received a letter from Giles, and I was asking her about it, and she said that Bruce was talking of leaving, and she said if he left, why, she could hire some person to run the farm and then live in peace. She said all that was the matter with Bruce he wanted to marry and bring a wife there, and she said he couldn't do that while she lived, but she said if Giles wanted to marry and bring a wife there, he could, because she could live with him but she couldn't with Bruce if he had a wife; and she said if the rest of her children couldn't stay at home she didn't care whether he did or not. And, at another time I was over there and she spoke about Dona, boarding Dona and Rollie and get Dona to wait on her; that Dona was being with the hired girl, that Dona was staying in the kitchen with the girl most of the time, as

she was awful lonesome, that she was in the room so much by herself, and whenever she wanted anything she had to call her, and she said she wished Giles was there for he was so good to wait on her. This was sometime in November, I think about the last. Bruce came to our house and I told him I thought his mother was in a poor situation to go off and leave her, that she was sick and weak and her mind I didn't think was right, and he says, "No, I don't think it is either and haven't thought so for a long time." He said she (his mother) talked about him, he could hear it around among the neighbors.

Witness Mrs. Bell Hogarthy related a conversation with Bruce; she said to Bruce: "I don't think her mind is right," and he said, "No, I don't believe it is either, and it hasn't been for some time," and he said that his mother cared less for him than any of the children and always did, and I said, "Bruce, she always seemed to think a great deal of you," and he said it was all put on, she didn't mean it.

Witness Sallie Brent, for plaintiffs, testified that Bruce stated to her that his mother's mind was not right; he said to her, "You go ahead and do your own work in your own way and don't pay any attention to her whatever." She gave additional testimony about Bruce's abusing and talking rough to his mother and about a difficulty between Bruce and his brother Giles. This witness also related conversation between Mrs. Rader, the testatrix, and her son Giles; she says that: "Mrs. Rader told Giles, being as he was going away, she would tell him that Bruce had been trying to get her to make a will and will him out, and he asked her why, and she told him why Bruce wanted him willed out. Mrs. Rader told Giles when he went away and he didn't have any money, to remember that he had a mother that always had money and for him to write to her if he needed any and she would send it to him, and she asked him if she would write to him to

come home if he would come, and he said he would.  He said if she wrote for him to come home he would come.''

Freeman Glass, a witness for plaintiff, testified about a difficulty between Bruce and his father in 1894.

Z. F. Taylor testified in behalf of plaintiffs partly as follows:

August, 1899.  .  .  .  In fact to state, really, her and her husband, before he died, and then afterwards, Bruce and she both asked me to go there to work.  To make it sorter plain, so this jury can understand it, I went there to work to repair a barn for them, and Mrs. Rader then talked to me about it.  That was all that I went at the present time to do, was to repair the barn. And she spoke about other work but she wasn't willing to do it, but Bruce wanted other work done, he wanted the house repaired and in repairing the house they differed on it.  She didn't want to spend the money in regard to repairing the house, and Bruce just told me, he said, ''You just hold still, I know how to work mother; I am going to have the work done.''  I said, ''Bruce, how is things to be paid for,'' and he said, ''It don't make any difference.''  I said, ''You can't take your father's money,'' he was administrator, ''and appropriate it on this house,'' and he said, ''I'll work that.''  That was his language in regard to the work. Then they differed several times in things that way, but he always carried his own way.  He controlled.  .  .  . I went ahead and repaired the house.  Then another conversation came up.  One morning Bruce came out to me and said, ''We have had a fuss.''  I was out at work, and he said, ''We have had a fuss,'' and I said, ''What?''  He said, ''Giles wants some money and I intend that he shall not have it; I am going to pay a debt he owes of $50.''  It passed on, and when she (testatrix) got a chance by herself, why, she mentioned to me about it and told me that she intended that Giles should have the money.  Giles went away, he was going away some place, I don't know where he went, he was

going away some place, and after he left she then mentioned to me and said that Giles was the only one of her children that she could risk keeping her accounts, and that Giles attended to her books. This witness further stated that he had heard Bruce tell his mother that she was crazy and wasn't capable of attending to business.

C. H. Vanatta testified that he heard Mrs. Julia Fowland, one of the defendants in this cause, say that her sister Eulalia and Giles did not know anything about the death of their mother; that the last letter I got from Eulalia they were going to Colorado and that she did not know the whereabouts of Giles.

A. H. Gorrell, a witness for plaintiff, sometime in 1899 went over to Mrs. Rader's to buy some cattle. He had a conversation with Bruce about some of the cattle, thought the price fixed by Bruce was too high and remarked to him that perhaps they had better see his mother, and Bruce replied: "No, she didn't do any business anymore, she didn't transact any business at all, her mind wasn't in condition to transact business at all, she didn't transact business at all."

There is other testimony in the record tending to show that Giles Rader gave his mother a great deal of trouble in money matters, that, while she loved him, she realized that he was guilty of improper acts in trying to raise money by questionable methods, and she was compelled to come to his relief, in order to prevent his being plunged into serious trouble.

There is other testimony tending to show that she was not going to leave Giles any of her estate and also that she would not leave her daughter, Mrs. Puntney, anything, for the reason that she had said that she would buy fine carriages and things of that kind.

This is a sufficient reference to the facts which are relied upon to support this judgment. We will further treat of the facts, as well as the instructions, in the course of the opinion.

Upon the submission of this cause to the jury, upon

the instructions of the trial court, a verdict was returned finding that the paper-writing read in evidence was not the will of Elizabeth R. Rader, and judgment was rendered accordingly.

From this judgment defendants, in due time and proper form, prosecuted their appeal to this court, and the record is now before us for review.

## OPINION.

The first proposition confronting us for consideration is in respect to the sufficiency of the showing made by defendants as to the formal execution of the will, in signing and attesting it, and the action of the trial court in refusing to direct the jury to find that the will was properly signed and attested. We have carefully considered the testimony of the two subscribing witnesses, as disclosed by the record. While their testimony is somewhat remarkable, in view of the proof made by them in the admission of the will to probate in the probate court, yet, when it is fully considered, it substantially shows a compliance with the statute directing the manner of the execution of wills. These witnesses were there for the purpose of attesting Mrs. Rader's will; the will was written by Bruce Rader in their presence; they were all together in a comparatively small room; Mr. George heard Mrs. Rader say she wanted the will written, and says it was written, read over to her, and she was raised up in bed to affix her signature; heard her say there was no ink on the pen, saw some one take the pen to the ink bottle, dip it in and return it to her. This was all done and said in the presence of both witnesses; they attested the will in the same room in the presence of the testatrix, identify their signatures to the attestation; go before the probate court and make oath that she was of sound and disposing mind; and attest it at her request. Mr. DeJarnett, the other subscribing witness, assisted in raising his sister up in bed to sign the will. He was

made executor of it and took charge of it after it was written. He, as a subscribing witness, was present in the room all the time the will was being written; what was said and done, as testified to by Mr. George, the other witness, was in the presence of Mr. DeJarnett. There can be but one conclusion from the testimony upon this subject, and that is that the two subscribing witnesses went to Mrs. Rader's to witness and attest her will, and they did what they went there for.

The mere fact that Bruce Rader requested the presence of the witnesses, or that Mrs. Rader did not proclaim the instrument as her last will and testament and verbally request the witnesses to attest it, is not sufficient to annul the instrument on the ground of non-compliance with the statute. Actions sometime speak louder than words, and no impartial mind can view the acts and conduct of all the parties in the room where this will was executed, together with all the conditions and circumstances surrounding the execution of this instrument, and reach any other conclusion than that the testatrix signed this will and that it was properly attested by the subscribing witnesses.

This court has expressed itself in no doubtful terms upon the proposition now under discussion. VALLIANT, J., speaking for the court, in Schierbaum v. Schemme, 157 Mo. 1, said: "It is suggested that it does not show that the witnesses subscribed it at the request of the testator. The whole conduct, however, was a sufficient request. The paper itself purported to be the will of Henry Schemme, it had been read in the presence and hearing of all and when he said that it was right it was equivalent to a formal proclamation that it was his will, and when he signed it and passed it at the table to the witnesses who signed it in his presence his act constituted a request that they sign it; it could mean nothing else and was as significant to that effect as if it had been put in formal words."

So it may be said in this case, the subscribing wit-

nesses being present, the will prepared in the presence of the testatrix, read over to her, as stated by Mr. George, she signs it and it was passed to a table in the same room, and, in the presence of the testatrix, the witnesses signed it, these acts in effect constitute a request from the testatrix to sign it; it could mean nothing else.

In Martin v. Bowdern, 158 Mo. 379, it is said: "There was no formal, verbal declaration by the testator in the presence of the witnesses that it was his last will, and no formal, verbal request by him to the witnesses to attest it, but the testator dictated the will, he knew the witnesses were waiting outside of the room to attest it, and that they were called in for that purpose, and in their presence he signed it, and the draughtsman requested the witnesses to attest it. This was a sufficient request to them to do so. [Schierbaum v. Schemme, 157 Mo. 1; Grimm v. Tittman, 113 Mo. 56; 29 Am. and Eng. Ency. of Law (1 Ed.), 205, note 6.]"

BRACE, J., in the recent case of Southworth v. Southworth, 173 Mo. l. c. 74, discussing the testimony of subscribing witnesses, very forcibly expressed the views of this court on that subject. He said: "But there was no substantial evidence tending to prove that he was not fully competent to make a will at the time the instrument in question was executed, or at any other time prior to his removal to Henderson's, unless it can be found in the evidence hereinbefore set out of the two recusant witnesses. As to this evidence, little need be said. In a recent excellent work on Wills, it is said: 'As matter of law, a person who as a subscribing witness goes upon the stand and upon his oath asserts to be false that which at the execution of the will he, by a most solemn act, asserted to be true, deserves to be discredited, and it is worthy of but little belief.' 'Lord Mansfield was of the opinion that a subscribing witness impeaching his own act was deserving of the pillory.

(Walton v. Shelly, 1 T. R. 300.)' [1 Underhill on Wills, section 213, and note.] And in this case, in which this evidence was inconsistent with and repugnant to every fact disclosed, whether of act done, or word spoken in the preparation and execution of this instrument or attendant thereupon, as testified to by themselves and the other attesting witness, the court was fully warranted in treating it as wholly worthless. The court committed no error in directing a verdict for the proponents upon this issue.''

This leads us to the consideration of the proposition involved in this contest, based upon the allegations in the petition, that the testatrix was not possessed of sufficient testamentary capacity to validly execute the will before us. In the consideration of this proposition, it is appropriate, at the very inception of our investigation of the question, that we keep in view the usual tests of capacity to make a will disposing of property possessed by a testator at the date of his death. In Maddox v. Maddox, 114 Mo. 35, we find the test of capacity thus discussed by MACFARLANE, J.: ''A witness was asked whether in his judgment, from his knowledge and observation of the testator, he was in November preceding his death 'competent to engage in or understand any complicated business matter or transaction.' An objection to the question was urged on the ground that such competency was not a proper test of mental capacity requisite to make a will. The objection being overruled the witness answered: 'If I had any complicated matter at that time I would not have been willing to entrust it to him to settle or manage for me.' It is clear that the test here made of testamentary capacity goes beyond what has ever been required under the decisions of this court. It is said in Brinkman v. Rueggesick, 71 Mo. 556, by NAPTON, J., that 'it is conceded in most of the cases that a man may be capable of making a will, and yet incapable of making a contract or managing his estate,' and in the case of Couch

v. Gentry (113 Mo. 248), it is said: 'If the testator understood the business about which he was engaged when he had prepared and executed his will, the persons who were the natural objects of his bounty, and the manner in which he desired the disposition to take effect, he was capable of making a will.' Competency 'to engage or understand any complicated business matter or transaction' requires too high a grade of capacity when compared with what is required under these decisions. Under that test a majority of men would be incapable of making a will.''

The rule as to the test of capacity sufficient to make a will is clearly stated in Sehr v. Lindemann, 153 Mo. l. c. 288. It was held in that case that, upon making out a prima facie case by the proponents of the will, it then devolves upon the contestants to establish incompetency or undue influence. The court, in announcing the rule, said: "By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons or objects he makes the beneficiaries of his bounty. Imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions or requiring a repetition of information will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to fulfill the above definition. Mere opinions of witnesses that the testator was 'childish,' or acted 'funny,' or was 'worse than a child,' or that there were 'inequalities in the will,' unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator 'knew what he was doing and to whom he was giving his property.' ''

This rule finds support in the uniform expression and unbroken line of decisions by this court. [Riley v. Sherwood, 144 Mo. 354; Berberet v. Berberet, 131 Mo. 399; Defoe v. Defoe, 144 Mo. 458; McFadin v. Catron,

138 Mo. 197; Fulbright v. Perry Co., 145 Mo. 432; Aylward v. Briggs, 145 Mo. 604.]

Measured by this rule, after a full, fair and impartial consideration of all the evidence disclosed by the record, we can not escape the conclusion that there is an entire absence of any substantial testimony showing mental incapacity on the part of Mrs. Rader to dispose of her property by last will. It is true she was weak and in feeble health and her mind not as strong and vigorous as when in perfect condition; but this furnishes no test as to capacity to execute the instrument. If the testimony in this cause is to be regarded as sufficient to authorize the annulment of this will, on the ground of incompetency, then we confess it in effect precludes the exercise of the right of disposition of property by all those who undertake to exercise it at a time when they are unfortunately overtaken by ill health. The mere expressions by the many witnesses that her mind was weak, that she did not look right since she was injured, and that her mind was affected, can not be made the basis for support of a finding that she was mentally incapacitated to execute her will. The expressions of ths court in Riley v. Sherwood, supra, may very appropriately be applied to this case; it was there said: "We are not unmindful of the sweeping expressions that the testatrix was 'childish,' and forgetful; that she was more feeble mentally than she had been in her more robust womanhood before she had suffered from her broken hip. In all this mass of testimony there is no evidence that she was incapable of transacting ordinary business, or was ignorant of her estate or the objects of her bounty. The mere statement that as she advanced in years her mind was not so vigorous as in her young womanhood imparts no information as to her want of capacity to dispose of her property. As was said in McFadin v. Catron, 138 Mo. 197, 'Such indefinite generalities will not suffice.' The law exacts something

more definite and tangible than such assertions to over-come the judgment of the disinterested business men and neighbors who transacted business with this tes-tatrix up to the time of her death without once question-ing her ability to transact her business in an intelligent manner. 'Opinion' evidence is very unsatisfactory at best, but when the facts upon which it is predicated dis-close that it is without any reasonable foundation, it has no probative force.''

Dr. Samuel Conway, the family physician, who at-tended Mrs. Rader in her last illness, fully supports her capacity to execute this will. He was not shown to have any interest or feeling in this case, and, while he concedes that she was weak, yet he says her mind was all right and there was nothing in the nature of the dis-ease with which she was afflicted to affect her brain.

He visited her just previous to her death, found her talkative, and she continued bright as long as he knew her; that she was capable of understanding who her children were; what her property was; what she was doing and what disposition she was making of it. He further stated that she was a bright, intelligent woman, rather above the average and she continued that way as long as he knew her.

The testimony of Miss DeJarnett, a sister of Mrs. Rader, and witness Clopton, neither of whom were leg-atees or devisees in the will, fully corroborates the opin-ino of Dr. Conway as expressed by him.

The testimony introduced by plaintiffs upon the subject now being discussed, falls far short of furnish-ing a basis for the submission of that issue to the jury.

The testimony of Mr. and Mrs. Pemberton, Mr. DeJarnett and other witnesses, consists of general state-ments that her mind seemed to be weak, and finally con-cluding that her mind was affected. The probative force of such testimony can only be fully appreciated by a consideration of some of the grounds upon which the conclusions of unsoundness of mind were reached. One

of the witnesses, Mr. DeJarnett, was opposed to wills, did not believe that an old person who was in feeble health could make a will. Another witness thought she was demented because she went on Bruce's bond as administrator of his father's estate. In fact, the testimony consisted of "indefinite generalities" as to her mental condition, without being predicated upon any clear, tangible fact which indicated her incapacity to execute this will.

It is strikingly remarkable the number of people who attempt to exercise the right of disposing of their property by will, as provided by statute, who are charged with being insane at the time of the execution of the instrument. While this court has uniformly maintained that, to exercise this right validly, the testator or testatrix must be able to comprehend the objects of his or her bounty, the property disposed of, and the manner of disposition; yet, on the other hand, a review of the comparatively recent cases by this court will demonstrate that the right guaranteed by the laws of this State to dispose of your property as you may deem proper, is no longer to be considered a mere idle, legislative expression, but that the statute means what it says, and is full of force and vitality. It is made apparent by this court, in numerous cases, that the owner of the property will be permitted to dispose of it, and this court will not tolerate the interference with the exercise of this right by others, with whose views the disposition did not happen to accord, by reason of some discriminations made in the instrument.

The proof in this case showed that the testatrix was possessed of sufficient testamentary capacity to execute this will and the court should have so declared; hence, it was error for the court, upon the evidence in this cause, to submit that issue to the jury.

The evidence was equally insufficient to show any conspiracy between defendant Bruce Rader and his sister to unduly influence Mrs. Rader in the execution of

her will, and the court correctly refused instruction 11 upon that subject.

As this case is to be retried, it is well that we give some expression of our views upon the proposition of undue influence. The rule upon this subject is well settled in this State. It is very aptly stated in Riley v. Sherwood, supra. It was there said: "In this State the rule is established that such influence must be such as amounts to overpersuasion, coercion or force, destroying the free agency and will-power of the testator. It must not be merely the influence of affection or attachment nor the desire of gratifying the wishes of one beloved and trusted by the testator. [Jackson v. Hardin, 83 Mo. 185; McFadin v. Catron, 138 Mo. 197.] It is not sufficient that one may have influence over the testator but it must be shown that influence was unduly or unjustly exercised. [Brinkman v. Rueggesick, 71 Mo. 553.] Nor will the mere existence of a motive and an opportunity to exert undue influence suffice. The burden is on the party asserting to prove that a will is the result of undue influence. [Carl v. Gabel, 120 Mo. 283; McFadin v. Catron, 138 Mo. 197, and cases cited.]"

In this case the record discloses that Bruce Rader, one of the beneficiaries in this will, was the draughtsman in the preparation of the instrument. Hence, it is important that all the facts and circumstances surrounding the parties at the time of the execution of the will should be carefully considered and his conduct should be subjected to a searching investigation. The rule upon this subject was thus clearly announced in Maddox v. Maddox, supra: "Undue influence, like fraud generally, can seldom be proved by direct and positive evidence. Where, therefore, extreme age and possible susceptibility to influence is shown in respect to the testatrix, and an undue portion of the estate is granted to one to the exclusion or partial exclusion of another having equal or greater demands upon his bounty, every fact and circumstance surrounding the

parties at the time of the execution of the will, and which bears upon it, should be examined with the utmost scrutiny to see if it were not the product of fraud or undue influence. 'Issues of . . . . undue influence are generally determined upon circumstantial evidence and inferences drawn from a full presentation of facts inconclusive when taken separately.' [Schouler on Wills, sec. 242.] But the fact that unjust discrimination was made, coupled with the other facts of old age and great debility of body are not sufficient to raise an inference that undue influence was exerted by one who received a greater portion of the estate. The tests are mental capacity and free agency. When these exist the testator has the right, as is said, 'to make an unreasonable, unjust, injudicious will, and his neighbors have no right, sitting as a jury, to alter the disposition of his property, simply because they may think the testator did not do justice to his family connection.' [Boylan v. Meeker, 15 N. J. Eq. 310; Mackall v. Mackall, 135 U. S. 171, and cases cited; Smith v. Smith, 48 N. J. Eq. 591; Jackson v. Hardin, 83 Mo. 185.]''

In Berberet v. Berberet, 131 Mo. 399, the son, Enos B. Berberet, was a beneficiary in the will and was named as executor of it. He, as in the case at bar, prepared the will; an instruction reciting these, together with other facts, and telling the jury that this shifted the burden of proof upon the defendants to show that the will was fairly obtained, was condemned, and BURGESS, J., in discussing the instruction, announced very clearly and forcibly the rule upon that subject. He said: ''The presumption is in favor of the validity of the will and the fact of unjust discrimination in its provisions, if such be the case, and the other facts before stated did not shift the burden of establishing its validity on the defendant. There must have been undue influence exercised in the procurement of the will. [McFadin v. Catron, 120 Mo. 252; Maddox v. Maddox, 114 Mo. 35.] It is not enough that Enos B. Berberet

had great influence over his mother in respect of her business affairs alone in order to shift the burden to him in explanation of such discrimination, but it must be shown that he procured the execution of the will by the exercise of such influence and thereby gained an unfair advantage. A testator having sufficient mental capacity has the right 'to make an unreasonable, unjust injudicious will, and his neighbors have no right, sitting on a jury, to alter the disposition of his property, simply because they may think the testator did not do justice to his family connection.' [Boylan v. Meeker, 15 N. J. Eq. 310, quoted with approval in Maddox v. Maddox, supra; see, also, Mackall v. Mackall, 135 U. S. 171, and cases cited; Smith v. Smith, 48 N. J. Eq. 591; Jackson v. Hardin, 83 Mo. 185; Farmer v. Farmer, 129 Mo. 530.]''

Doubtless the ruling of the learned trial judge presiding in this cause was in harmony with the rule laid down by Judge Burgess in the case just cited. This is made apparent by his correct refusal of instruction 13, announcing an opposite doctrine.

In the consideration of this case we find great prominence, in fact too much, given the fact of discrimination between the children in the provisions of the will. The very purpose of the statute, in providing for the disposition of property by will, was to enable the testator to discriminate if he deemed it wise to do so. Hence, the fact of discrimination, where there are other facts showing unsoundness of mind or undue influence, may be considered simply as a circumstance in connection with such other facts; but, of itself, it is insufficient to establish either mental incapacity or undue influence.

In McFadin v. Catron, 120 Mo. l. c. 273 and 274, Burgess, J., in support of the conclusion reached in that case said: "In Knox v. Knox, 11 So. 125, it is said: 'In the next place, the law does not undertake to prescribe the duties of a testator to his family, in regard to the disposition of his property; and again, although

a testator might not dispose of his property equally to his next of kin, that fact alone does not raise a presumption of mental incapacity or undue influence. The manner in which a testator disposes of his property is a fact in evidence, to be considered with other facts in determining the issue; but there is no conclusion of law from such a fact as to shift the burden of proof upon proponent or the beneficiaries under the will, to show a sound mind or freedom of will on the part of the testator. It is a mere circumstance to be weighed by the jury.' [Eastis v. Montgomery, 9 So. 311.]"

In commenting upon this quotation, he further concludes: "This we understand to be the rule announced in Maddox v. Maddox, 114 Mo. 35, and which we think sustained by both reason and authority."

To the same effect is the Catron case, 138 Mo. l. c. 226. GANTT, J., in discussing the fact of discrimination in the will in that case, said: "When this case was here on the former appeal it was said: 'The presumption is in favor of the validity of the will, and it can not be that the mere fact of unjust discrimination in its provisions, without more, shifts the burden on defendant.' Inequality alone raises no presumption of undue influence. [Farmer v. Farmer, 129 Mo. 530; McFadin v. Catron, 120 Mo. 252; Maddox v. Maddox, 114 Mo. 35; Berberet v. Berberet, 131 Mo. 399.]"

It will thus be seen that the fact of discrimination in the provisions of a will is simply a circumstance that may be considered in connection with other facts and circumstances, tending to establish the main fact sought to be proven, and instructions which give undue prominence to the fact of unequal distribution of property are subject to criticism and are faulty for that reason. There was no error in the action of the court in its refusal to give instruction 8, requested by defendants. This instruction was too broad, in this, it told the jury that they were not to consider the fact of the unequal distribution of the property, as provided by the will.

That is not the law, as we have herein pointed out; they had the right to consider that fact as a circumstance in connection with the other facts and circumstances tending to show the exercise of undue influence by Bruce Rader over the mind of his mother, in the execution of the will involved in this suit; on the other hand, instruction 6, for plaintiff, is equally objectionable, for the reason that it selects certain circumstances in proof before the jury, and tells them to consider them, and this objection is emphasized by the failure of the court to expressly require that the circumstances mentioned in the instruction should be considered in connection with the other facts in proof.   This instruction is as follows:

"The jury in determining whether the will in controversy is the will of Elizabeth R. Rader, may take into consideration the relation of the parties to the deceased, the unequal distribution of the testatrix's property, the presence of the parties, or any of them, at the time the will was made, if any of them were present, the testimony as to what took place at the time the will was made, and any testimony as to any statements made by the testatrix either before or after the will was made as to her feelings towards the plaintiffs or defendants, or any of them, and if, from all the facts and circumstances in evidence in this case, the jury shall find that the will was procured by the undue influence of the defendants, or either of them, then they will find for the plaintiffs, provided, however, that any statements which you may find from the evidence that the testatrix may have made before or after the will was made, as to her feelings towards the plaintiffs, or either of them, or the defendants, or either of them, or expressing a desire to provide for the plaintiffs, or either of them, or to exclude from her bounty the defendants, or either of them, should only be considered by the jury as evidence of the feelings of the said Elizabeth R. Rader towards the

plaintiffs, or either of them, or the defendants, or either of them, and for no other purpose."

It will be observed that in this instruction, after reciting certain facts which the jury are told to consider, follows the direction, "and if, from all the facts and circumstances in evidence in this case, the jury find," etc., etc., their verdict should be for the plaintiff.

The error of that instruction consists in singling out certain facts and directing the jury to consider them, and leaving it in doubt, by the terms of the instruction, as to whether or not the facts enumerated constituted all the facts to be considered. It is only by implication from the terms, "and if from all the evidence," that the court indicates that the circumstances designated are to be considered in connection with the other proof in the cause. The circumstances embraced in the instruction were all before the jury, and it was their province to consider them; but where the proof covers a large field, consisting of different circumstances, which, in connection with other proof, would tend to prove the main fact, it is more in harmony with precedent, and the rules of law applicable to instructions, to cover the entire ground with a general instruction, and let counsel, in the presentation of the case, argue the facts that are contemplated and in effect embraced in the general instruction.

Instruction 1, for plaintiff, is concededly erroneous; doubtless it is so from a simple clerical mistake in the use of too many words to which the attention of the learned trial judge was not called.

This leads us to the consideration of the only remaining question we deem it necessary to consider in this cause. That is as to the improper admission of incompetent and irrelevant testimony upon the trial. In the trial of cases of this character great latitude is indulged in the introduction of testimony; however, such indulgence must not be regarded as an absolute abolish-

ment of the rules of evidence. The testimony offered and admitted must at least have some tendency to establish the facts at issue by the pleading. The testimony of the fights and quarrels between Bruce Rader and father, a number of years previous to the execution of the will, in our opinion was clearly inadmissible. It is not the father's will that is in contest, and we are, unable to conceive of any theory upon which a difficulty with his father, in 1894, had anything to do with the procuring of this will. It was error to admit that testimony; it could serve no purpose except to arouse the prejudice of the jury, without any tendency to establish any matter put in issue by the pleadings.

We have thus indicated our views upon this case, as presented by the record before us; it is a remarkable one in many respects; it has some extremely sad features; it is a legal struggle between brothers and sisters, and abounds with bitter details, by witnesses, of the sad life of the testatrix. Life is too short for even strangers to spend much of it in litigation; but when we are confronted, as in this case, with the same flesh and blood engaged in a strong legal battle over a comparatively small amount of property, it presents rather a serious and sad picture of our race.

If the parties to this suit would get together and give as much kindly thought and feeling to recalling the pleasant memories of the noble traits of character and many womanly virtues of the mother who made this will, as they have displayed in the way of energy and feeling in this legal contest, the unsightly monument they are erecting for their lives in the future, by the record of this case, would ascend no higher.

Entertaining the views as herein expressed, the judgment of the trial court is reversed and the cause remanded. All concur.